[No. B095962. Second Dist., Div. Seven. Dec. 17, 1996.]

ANNA STRASBERG, as Executor, etc., Plaintiff and Respondent, v. ODYSSEY GROUP, INC., et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part I of the Discussion section.

### COUNSEL

Kimberly K. Mays and Robert H. Berman for Defendants and Appellants.

Gibson, Dunn & Crutcher, William E. Wegner, Vivienne A. Vella and Thomas G. Hungar for Plaintiff and Respondent.

### OPINION

**JOHNSON, J.**—Anna Strasberg, as the present sole beneficiary of Marilyn Monroe's personal effects under Ms. Monroe's will and as administrator of her estate, brought suit for conversion, unjust enrichment, injunctive relief and a declaration of a constructive trust to prevent an auction of certain of Ms. Monroe's personal effects. A jury found Marilyn Monroe's business manager and assistant had converted these items after Ms. Monroe's death. Accordingly, the trial court imposed a constructive trust on the personal effects and ordered the auction house to return the items to Anna Strasberg. The business manager's successor in interest and the auction house appeal from the judgment and the trial court's denial of their motion for judgment notwithstanding the verdict. We affirm.

## Facts and Proceedings Below

Marilyn Monroe died on August 5, 1962, in Los Angeles, California. Ms. Monroe's last will and testament was probated in New York and admitted for ancillary proceedings in California in January 1963. In her will Ms. Monroe made provisions for certain friends and family members. Ms. Monroe bequeathed Lee Strasberg, her acting coach and trusted confidant, "all of my personal effects and clothing," as well as the residue of her estate.[1]

From the early 1950's Ms. Monroe employed Inez Melson as her assistant and business manager. According to Melson's relatives the relationship between Ms. Monroe and Melson developed into something akin to a mother/daughter relationship. Melson took care of Ms. Monroe's recluse mother. On at least one occasion, Ms. Monroe spent the Thanksgiving holiday with Melson's family.

Ms. Monroe did not bequeath any property to Melson in her will.

When Ms. Monroe died her family asked Melson to make the funeral arrangements. Melson was also appointed special administrator for the estate of Marilyn Monroe by the Los Angeles Superior Court. In that capacity she was responsible for preparing an inventory and storing Ms. Monroe's property and effects. Thereafter, she was responsible for delivering them to the executor of Ms. Monroe's estate for the beneficiaries of Ms. Monroe's will.

Melson secured and took control of Ms. Monroe's home and its contents. According to a report filed by the ancillary executor with the probate court, after Ms. Monroe's death "[t]here were mobs of curiosity seekers who came to the house, many of whom sought to buy or remove curios and memorabilia."

Melson also obtained access to Ms. Monroe's office at 20th Century Fox Studios. Melson removed all of Ms. Monroe's files and personal effects from the studio and moved them to her own office.

Prior to the final accounting Melson provided the probate court with a detailed statement of her activities as well as an inventory of all items which were to be sold. One of the items listed on the inventory was a legal size file cabinet. Melson received a commission of $3,500 for her services as special

---

[1]In this portion of her will Ms. Monroe directed that her personal effects and clothing were to go to Lee Strasberg, "or if he should predecease me, then to my Executor hereinafter named, it being my desire that he distribute these, in his sole discretion, among my friends, colleagues and those to whom I am devoted."

administrator. Melson's services ceased in October 1963 at which time she represented to the probate court "all personal property" of the decedent had been turned over to the proper distributees. In July 1976, the probate court entered an order approving the final distribution of the estate.

Thereafter, Lee Strasberg, as beneficiary of Ms. Monroe's personal effects, received numerous boxes containing Ms. Monroe's clothing, papers and other personal property. Some of the boxes had suffered water damage while in storage. Lee Strasberg aired out the items, catalogued them and arranged for their storage in a temperature controlled storage facility.

With the exception of two letters which he returned to their authors, during his lifetime Lee Strasberg never sold or gave away any of Ms. Monroe's personal effects. The author(s) of these two letters was (were) undisclosed but the author was not Melson. Despite numerous requests, Lee Strasberg refused to permit the media access to any of Ms. Monroe's private letters or documents.

At Lee Strasberg's request, Melson returned to him certain items she had which had belonged to Ms. Monroe: a green sequined gown, a flesh colored gown, a full-length white beaver coat and a Rodin statue.

Lee Strasberg died in February 1982. In his will he bequeathed Ms. Monroe's personal effects and clothing to respondent, his wife Anna Strasberg, executor and sole beneficiary of Lee Strasberg's will. Since his death she has continued Lee Strasberg's policy of preserving Ms. Monroe's privacy.[2] She has refused to allow the media access to Ms. Monroe's letters or documents. She has not sold any of the Monroe legacy. On the other hand, Anna Strasberg has donated a few of Ms. Monroe's items to be auctioned to benefit AIDS and children's charities. She also authorized the display of one of Ms. Monroe's dresses for a tribute to Hollywood organized by the Metropolitan Museum of Art in New York.

After Ms. Monroe's death, Melson held numerous documents, letters and personal items which had belonged to Ms. Monroe. These items included an unexpired driver's license, divorce decrees, prescription glasses, personal telephone and address book, a love letter from Joe Di Maggio, tax returns, and original studio and film contracts as well as a letter she had written to her psychiatrist. Initially, Melson stored the items at her office in Hollywood. In later years she moved them to a file cabinet in her garage. Melson

[2]Although the ancillary proceedings in Ms. Monroe's probate estate concluded in 1976, the probate proceedings in New York are ongoing and Anna Strasberg is currently the administrator of the estate of Marilyn Monroe.

assisted an author researching a book on Ms. Monroe's life by allowing him to view the personal items, letters and documents she held. The author apparently gave Melson credit in his book as the source for some of his information. In another instance Melson also allowed a Fox Television producer access to Ms. Monroe's personal effects to prepare a television documentary on Ms. Monroe's life.

Roger Richman, a licensing agent for the Monroe estate, contacted Melson in an attempt to learn as much as possible about film or other contracts Ms. Monroe might have had with the various studios. Apparently, Richman learned nothing about the film and studio contracts Melson had in her possession.

Melson died in July 1985. Not long before her death she gave the Monroe memorabilia in her possession to Ruth Conroy, her sister-in-law, or to both Ruth Conroy and Conroy's son. In late 1993 or early 1994, Ruth Conroy gave her interest in the Monroe memorabilia to her son, appellant Millington Conroy. Based on various conversations with his mother and aunt, he believed his aunt, Melson, rightfully owned the memorabilia, either because Ms. Monroe had given the items to her prior to her death or because Lee Strasberg did not want them.

Shortly thereafter Conroy decided to consign the memorabilia to an auction house which would assure the best publicity and, in turn, highest prices. Conroy selected appellant Odyssey Group, Inc., which specializes in celebrity memorabilia. Conroy met twice with Odyssey Group, Inc., personnel. After several hours of discussions and review of the items, Patrick Miller, an owner of Odyssey Group, Inc., was satisfied these items had belonged to Ms. Monroe and that Conroy was the rightful owner.

Based on his lengthy discussions with Conroy, Miller prepared an auction catalog with descriptions of the Monroe memorabilia. In the introduction to "The Marilyn Monroe Collection" the catalog states: "The fabulous archive offered here reveals a Marilyn heretofore known only to the very few who were close to her. It introduces us to Gladys Baker, the mother Marilyn kept hidden away in a sanitarium; her very existence denied by her daughter. Included here are the letters Gladys wrote—confiscated by Marilyn before they reached their intended destination and relegated to a file, never to be read until now.

"This archive represents the ultimate offering of Marilyn Monroe material ever to be offered anywhere, at any time. The collection, which belonged to a close Monroe associate, has been stored away for over thirty years and never before viewed by the public.

"Here are the documents which established the star, changed the name and ended the marriages. The letters from the famous friends, the critics, the family members, the peers, the famous husband and even the sister of a President. . . ."

In May 1994, lawyers representing Anna Strasberg learned of the auction and sent her a catalog.

On May 12, 1994, Strasberg filed suit and obtained a temporary restraining order to prevent Conroy and Odyssey Group, Inc. (appellants) from selling or transferring the Monroe collection.[3] The complaint alleged causes of action for conversion, unjust enrichment, declaration of a constructive trust and injunctive relief. The court granted Strasberg's request for a temporary injunction and the parties later stipulated to a preliminary injunction.

Eventually the matter proceeded to a jury verdict. However, prior to reaching this stage, appellants demurred to the complaint, filed a motion for summary judgment, moved for nonsuit and requested a directed verdict. In these motions appellants variously asserted claims of a lack of evidence Ms. Monroe owned these items at her death, the action was barred by either the statute of limitations or laches, or the closure of the probate action made the present action res judicata. The trial court denied these motions and rejected appellants' legal and equitable defenses.

The jury found that at her death, Ms. Monroe owned nearly all of the items in the Monroe collection. In addition, the jury found Melson had wrongfully converted those items.[4] The trial court entered judgment in accordance with the jury's verdict and imposed a constructive trust on the Monroe collection. Appellants moved for judgment notwithstanding the verdict and for new trial, asserting the same alleged lack of evidence and legal and equitable defenses. The trial court denied these motions and appellants appealed.

---

[3] Prior to trial Ruth Conroy and Patrick Miller were dismissed as defendants from the lawsuit.

[4] The items the jury found were not wrongfully obtained by Melson were a stamp collection jointly created by Ms. Monroe and Melson, a letter from Ms. Monroe's mother to Melson, and photos from a movie set. The items the jury found were not owned by Ms. Monroe at her death were items belonging instead to her estate: the last check written on the estate of Marilyn Monroe and the estate file.

DISCUSSION

I. *Substantial Evidence Supports the Jury's Finding Marilyn Monroe Owned the Items in the Collection at Her Death.*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *The Action Was Not Barred by the Statute of Limitations or Laches.*

In the unpublished portion of the opinion we conclude substantial evidence supported the jury's conclusion Ms. Monroe did not give Melson the items in the collection but continued to own them at her death. We therefore concluded Anna Strasberg was entitled to a constructive trust to secure the return of those items unless her action was barred by the statute of limitations or laches.

Code of Civil Procedure section 338, subdivision (c) provides for a three-year statute of limitations for actions alleging conversion. Anna Strasberg claims the statute was tolled by the fraudulent concealment of the items in the Monroe collection until May 1994 when she first learned of the fraudulently concealed items from the auction catalog. Appellants, on the other hand, offer several theories to claim this action is barred by the statute of limitations or laches.[9]

 First, appellants state the rule it is the act of wrongfully taking the property which triggers the statute of limitations. Thus, appellants claim the statute of limitations ran decades ago, "regardless of Plaintiff's lack of

---

\*See footnote, *ante,* page 906.

[9]Appellants also argue Anna Strasberg's claims are res judicata. They point out a probate decree is a final determination of the property to which a beneficiary is entitled. (Citing *McLellan* v. *McLellan* (1941) 17 Cal.2d 552, 554 [110 P.2d 1034].) However, appellants also acknowledge the doctrine of res judicata will not preclude a beneficiary from challenging a final probate decree (1) if the property is considered after-discovered property or (2) if the property was fraudulently concealed during the probate. (See, e.g., *Medeiros* v. *Cotta* (1955) 130 Cal.App.2d 740, 749-750 [279 P.2d 814].)

In view of our conclusion substantial evidence supports the jury's finding Ms. Monroe owned the items at her death and that Melson failed to disclose their existence, we further conclude both exceptions would apply in this case to permit a collateral attack on the final probate decree by the beneficiary of the estate. Stated another way, because ownership of the items at issue in this case was not conclusively determined in the prior probate proceeding, the final decree of distribution cannot have a res judicata effect on the present litigation. (See, e.g., *Worton* v. *Worton* (1991) 234 Cal.App.3d 1638, 1647-1648 [286 Cal.Rptr. 410] [breach of fiduciary duty by concealing assets precludes reliance on res judicata defense].)

knowledge."[10] In support of this argument appellants cite cases stating this general principle. (See, e.g., *Coy* v. *E.F. Hutton & Co.* (1941) 44 Cal.App.2d 386, 390 [112 P.2d 639] [plaintiff's cause of action accrued the day of the alleged conversion of his stock, and suit against stockbroker filed more than four years later was barred by statute of limitations]; *First National Bk.* v. *Thompson* (1943) 60 Cal.App.2d 79 [140 P.2d 75], citing *Coy* v. *E.F. Hutton & Co., supra,* 44 Cal.App.2d 386, 390 [suit to recover shovel from person who purchased it from one who had not satisfied the terms of his conditional sales contract barred because filed more than three years after conversion].)

■ While this may be the general rule, our Supreme Court has noted an exception for cases in which a fiduciary has concealed the material facts giving rise to the cause of action. "Ordinarily the statute of limitations applying in conversion actions (Code Civ. Proc., § 388, subd. 3 [now subdivision (c)]) begins to run from the date of the conversion even though the injured person is ignorant of his rights. (*First Nat. Bank* v. *Thompson,* 60 Cal.App.2d 79, 83 [140 P.2d 75]; *Coy* v. *E.F. Hutton & Co.,* 44 Cal.App.2d 386, 389-391 [112 P.2d 639]; *Rose* v. *Dunk-Harbison Co.* [(1935)] 7 Cal.App.2d 502, 505-506 [46 P.2d 242].) This rule, however, is not absolute; for example, where there has been a fraudulent concealment of the facts the statute of limitations does not commence to run until the aggrieved party discovers or ought to have discovered the existence of the cause of action for conversion. (*Bartlett* v. *Pacific Nat. Bank* [(1933)] 110 Cal.App.2d 683, 694 [244 P.2d 91]; see *Rose* v. *Dunk-Harbison Co.,* 7 Cal.App.2d 502, 505; 2

---

[10]In 1982 the Legislature amended the three-year statute of limitations on actions involving conversion and expressly adopted the discovery rule for theft of certain types of articles. Code of Civil Procedure section 338, subdivision (c) now specifies "[t]he cause of action in the case of theft, as defined in Section 484 of the Penal Code, of any article of historical, interpretive, scientific, or artistic significance is not deemed to have accrued until the discovery of the whereabouts of the article by the aggrieved party, his or her agent, or the law enforcement agency which originally investigated the theft."

The Court of Appeal in *Naftzger* v. *American Numismatic Society* (1996) 42 Cal.App.4th 421 [49 Cal.Rptr.2d 784] held as a matter of law the discovery rule had also been implicit in prior versions of the statute stating the limitations period for conversion actions. The Court of Appeal in *Society of Cal. Pioneers* v. *Baker* (1996) 43 Cal.App.4th 774 [50 Cal.Rptr.2d 865] disagreed with the *Naftzger* court on this particular point but held the 1982 amendment adopting the discovery rule for theft nevertheless applied to all pending matters not already barred by the statute of limitations or otherwise. (43 Cal.App.4th at pp. 783, fn. 10, 784.)

Thus, the current version of Code of Civil procedure section 338, subdivision (c) would appear to be dispositive of appellants' arguments claiming the statute of limitations had run in this case regardless of the Strasbergs' knowledge. However, Anna Strasberg failed to raise the issue at trial and did not rely on the discovery rule of the statute in defending against appellants' arguments asserting the statute of limitations defense. Thus, in fairness we address appellants' contentions raised and argued in the trial court and in their motion for judgment notwithstanding the verdict. However, it appears the amended version of Code of Civil Procedure section 338, subdivision (c) would likely apply in future cases to preclude a statute of limitations defense in cases involving similar factual circumstances.

Wood on Limitations (4th ed., 1916) 858-859; cf. *Pashley* v. *Pacific Elec. Ry. Co.* [(1944)] 25 Cal.2d 226, 229 [153 P.2d 325].)

"Since a fiduciary has a duty to make a full disclosure of facts which materially affect the rights of the parties, it seems obvious that any act by him amounting to a conversion of trust property is akin to a fraudulent concealment. [Citations.] This is in accord with statements in many decisions that statutes of limitations do not begin to run against an action for breach of a voluntary trust until there has been a repudiation which is brought home to the beneficiary. [Citations.]" (*Bennett* v. *Hibernia Bank* (1956) 47 Cal.2d 540, 561 [305 P.2d 20]; see also *Sears* v. *Rule* (1945) 27 Cal.2d 131, 147-148 [163 P.2d 443]; *Hobart* v. *Hobart Estate Co.* (1945) 26 Cal.2d 412, 436-441 [159 P.2d 958]; 3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 469, p. 499 [in actions against a fiduciary accrual of the cause of action is delayed until the beneficiary has knowledge or notice].)

■ Melson, while acting in her capacity of a fiduciary, wrongfully concealed the items she chose to retain from the Marilyn Monroe estate. Accordingly, the statute of limitations was tolled until the beneficiary discovered or ought to have discovered the existence of the cause of action for Melson's conversion. Anna Strasberg testified she learned for the first time Lee Strasberg had not received all of Ms. Monroe's personal effects as specified in her will when she saw the Monroe collection items offered in Odyssey Group, Inc.'s auction catalog in May 1994. Anna Strasberg brought suit to recover the converted property within days of this knowledge and clearly within the three-year limitations period.

■ Appellants nevertheless argue the three-year statute of limitations was instead triggered in 1976 when Melson repudiated the trust by failing to disclose in her reports to the probate court those personal effects of Ms. Monroe which she retained for herself. ■ This argument must be rejected because repudiation of a trust is not effective, and therefore cannot commence the running of the statute of limitations, unless and until the fact of repudiation is "brought home to the beneficiary." (*Bennett* v. *Hibernia Bank, supra,* 47 Cal.2d at p. 561; see also 3 Witkin, Cal. Procedure, *supra,* Actions, § 437, p. 468 [when the converter is a fiduciary the statute does not begin to run until the repudiation has been brought to the notice of the beneficiary].)

■ In this case the jury found on substantial and conflicting evidence Melson had not informed the executor of Marilyn Monroe's estate nor the beneficiaries under Ms. Monroe's will she had retained some of Ms. Monroe's personal effects for her own use and enjoyment. Because this fact was

not brought home to the beneficiaries, Melson's secret repudiation of the trust in 1976 did not trigger the statute of limitations.

■ Next appellants argue that even if Melson wrongfully converted the property and did not effectively repudiate the trust in 1976, the cause of action accrued in 1985 when the Conroys took possession of the property as involuntary or constructive trustees at Melson's death, again regardless of the Strasbergs' knowledge of the true facts. (Citing *Norton* v. *Bassett* (1908) 154 Cal. 411, 415-416 [97 P. 894] [at trustee's death beneficiaries' request for an accounting was denied and their suit to impose a constructive trust brought against the trustee's heir more than five years after the trustee's death was barred by the statute of limitations]; *Barritt* v. *Barritt* (1933) 132 Cal.App. 538, 543 [23 P.2d 54] [beneficiary's cause of action against constructive trustee's heirs and administrators to recover partnership property accrued at partner's/constructive trustee's death and action brought nine years later barred by the statute of limitations]; *Broder* v. *Conklin* (1898) 121 Cal. 282 [53 P. 699] [creditors' suit to impose constructive trust against attorney for trustee of insolvent's estate who purchased insolvent's property at public sale barred by statute of limitations because filed over seven years after full knowledge of both extent of property and sale].)

Anna Strasberg does not quarrel with the propriety of the rules stated in these decisions involving involuntary trustees as successors in interest to voluntary trustees. Instead she argues these theories and decisions are inapplicable because, unlike the present situation, the plaintiffs in each of these decisions knew about the property in question, knew who held the property, and either had actual knowledge or reason to know the property had been transferred out of the trust to an unauthorized person.

We agree. In each of the above cited cases there were no allegations of wrongful concealment. In each case the plaintiffs had the requisite knowledge at the time their causes of action accrued. The law therefore required them to take some responsibility to enforce their rights under the trust. (See, e.g., *Naftzger* v. *American Numismatic Society, supra,* 42 Cal.App.4th 421, 429 [an owner who entrusts his property to another bears some responsibility for creating a situation whereby an innocent purchaser is led to buy goods from an agent who is acting in excess of his authority]; cf. *Wilkerson* v. *Seib* (1942) 20 Cal.2d 556, 561 [127 P.2d 904] [in the case of an involuntary trust the statute is tolled as to the owner of the property until he is charged with notice].) These decisions are therefore legally and factually distinguishable from the situation in the case at bar where the beneficiary was ignorant of the existence of the property, the extent of the property, had no reason to believe the "trustee" wrongfully withheld "trust" property or had transferred

the property out of the "trust" to an unauthorized person. Accordingly, these decisions holding causes of action to recover trust property accrue at the death of the voluntary trustee or by an unauthorized transfer of trust property cannot control the proper disposition of this case.

Next appellants argue that even if Melson fraudulently concealed the items in the Monroe collection, her bad state of mind cannot be imputed to appellants, who believed they had valid ownership and possession of the property. Accordingly, appellants argue if Melson's fraudulent concealment acted to toll the statute of limitations, the tolling ended when such fraudulent intent ended, i.e., when appellants acquired possession.

This argument is beside the point. We agree no charge of intentional wrong is imputable to appellants. (See, *San Francisco Credit C. House* v. *Wells* (1925) 196 Cal. 701, 705 [239 P. 319].) Appellants' bad or good faith is simply irrelevant. The reason they are defendants in this action and the reason they are held to be constructive trustees of the Monroe collection is not because they have committed any wrong themselves nor because Melson's wrongful intent is imputed to them. Instead it is because they received possession of the items from one who had no legal title and therefore no right to transfer the items. (See *Harpending* v. *Meyer* (1880) 55 Cal. 555, 550-561; *San Francisco Credit C. House* v. *Wells, supra,* 196 Cal. 701, 706.) Thus, appellants have no lawful claim to this property as against the rightful owner. (*Harpending* v. *Meyer, supra,* 55 Cal. 555, 559 [the guilty party had no rightful possession against the true owner, and he could convey none to another].) Accordingly, they are bound to turn the items over to their rightful owner regardless of their innocent intent and despite their innocence of having fraudulently concealed the true facts from the Strasbergs.

Next appellants argue that even if the fraudulent concealment by the fiduciary tolled the statute of limitations the doctrine should not be applied in this case. Although appellants acknowledge Anna Strasberg both pled and testified she had no knowledge of the conversion until she saw the auction catalog in May 1994, appellants claim she failed to prove Lee Strasberg, her predecessor in interest, also had no knowledge of the conversion. They point out Anna Strasberg can inherit no greater rights than those possessed by Lee Strasberg. Thus, if he knew about the conversion the statute of limitations was not tolled during his lifetime and indeed would have expired prior to his death.

Appellants' argument is legally sound. It is true if Lee Strasberg either knew about the conversion or authorized Melson to retain possession of Ms. Monroe's personal effects then the present action could not be maintained.

Moreover, appellants' observation is correct there was no direct evidence to establish Lee Strasberg's—now deceased—knowledge or lack of knowledge about the conversion. Nevertheless, appellants' argument cannot be sustained.

First it must be noted appellant's legal theory throughout the litigation was the statute of limitations had run either with Melson's repudiation of the trust, with her death in 1985 or three years after the Conroys gained possession as new converters of the items, regardless of Anna or Lee Strasberg's knowledge. While demurring to the complaint, filing motions for summary judgment, nonsuit, directed verdict, judgment notwithstanding the verdict and for new trial, appellants consistently argued the state of a plaintiff's knowledge was irrelevant to the issue of when a cause of action for conversion accrued. Lee Strasberg's knowledge was not raised as an issue until appellants' reply brief submitted in support of their motion for judgment notwithstanding the verdict. At this stage of the game it was too late to permit Anna Strasberg to respond to this new defense.

■ The theory upon which a case was tried in the court below must be followed on appeal. An exception to this rule is "where a question of law only is presented on the facts appearing in the record." (*Curcio* v. *Svanevik*, (1984) 155 Cal.App.3d 955, 960 [202 Cal.Rptr. 499].) " 'But if the new theory contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at the trial the opposing party should not be required to defend against it on appeal.' [Citations.]" (*Adelson* v. *Hertz Rent-A-Car* (1982) 133 Cal.App.3d 221, 225 [183 Cal.Rptr. 779].)

Similarly in *Coy* v. *E.F. Hutton & Co.*, *supra*, 44 Cal.App.2d at page 391 the appellate court stated: " 'The rule is well settled that the theory upon which a case is tried must be adhered to on appeal. A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant. (2 Cal. Jur., sec. 68, p. 237.)' " (*Coy* v. *E.F. Hutton & Co.*, *supra*, 44 Cal.App.2d at pp. 391-392, quoting *Ernst* v. *Searle* (1933) 218 Cal. 233 [22 P.2d 715]; see also 9 Witkin, Cal. Procedure, *supra*, Appeal, § 262, p. 269 [a motion for a nonsuit must specify the ground to allow the opposing party to remedy the defect in his proof].)

■ In any event, the burden was on appellants to prove the validity of the transfer of the property to them. ■ As noted, when one of the parties in a fiduciary relationship obtains a possible benefit, equity raises

a presumption against its validity and casts upon the party the burden of proving affirmatively its compliance with equitable requisites to overcome the presumption of invalidity. (*Estate of Cover* (1922) 188 Cal. 133, 143-144 [204 P. 583].) ▮ Thus, in this case the burden was on appellants to prove Melson made the requisite disclosures and to affirmatively prove Ms. Monroe's beneficiary, Lee Strasberg, had full knowledge of the transaction. However, appellants failed to meet their burden of proof.

There necessarily could be no direct proof of Lee Strasberg's knowledge, having passed away prior to the present litigation. Nevertheless, the only reasonable inference from the evidence presented was he did not know Melson retained any of Ms. Monroe's personal property and would not have permitted her to retain these items had he known of their existence. The unrefuted evidence established Lee Strasberg refused to sell or even display any of Ms. Monroe's personal effects. After inventorying all the items he received at the close of the ancillary probate in Los Angeles, he stored them in a temperature controlled storage facility for safekeeping. During his lifetime he did not give any of Ms. Monroe's personal effects away, with the exception of two letters which he returned to their authors. No doubt Ms. Monroe's personal effects included mundane articles of clothing, as well as duplicates, or relatively uninteresting sets of casual attire. Nevertheless, there was no evidence Lee Strasberg permitted even the most common or uninteresting item to be given or thrown away. Consequently, it defies belief he would knowingly give away or allow someone else to keep crucial documents affecting some of the most significant and intimate aspects of Ms. Monroe's life.

Apparently, the jury perceived this proposition as incredible as well.

Moreover, the evidence established when Lee Strasberg discovered Melson had not turned over Ms. Monroe's gowns, fur coat and Rodin statue he demanded their return—behavior inconsistent with knowingly permitting someone else to retain Ms. Monroe's personal effects to which he was entitled under Ms. Monroe's will.

In sum, either because appellants have waived the issue on appeal, or because they are responsible for the failure of proof of Lee Strasberg's knowledge or because substantial evidence supports the conclusion neither Strasberg knew Melson had any of Ms. Monroe's personal effects in her possession until Anna Strasberg saw the auction catalog in May 1994, the absence of direct evidence of Lee Strasberg's knowledge does not present a

ground for granting appellants' request for judgment notwithstanding the verdict.[11]

DISPOSITION

The judgment is affirmed. Anna Strasberg to recover her costs of appeal.

Lillie, P. J., and Woods, J., concurred.

---

[11]Because substantial evidence supports the conclusion Lee Strasberg had no knowledge Melson had retained Ms. Monroe's personal effects, and because Anna Strasberg brought suit within days of first learning some of Ms. Monroe's personal effects had been converted, appellants' claim the suit is barred by the equitable doctrine of laches is without merit. (Cf. *Getty* v. *Getty* (1986) 187 Cal.App.3d 1159, 1169-1170 [232 Cal.Rptr. 603] [plaintiff waited nearly 30 years to bring suit despite knowledge of all relevant facts].)