Filed 12/23/14  Halligan v. Hillbrand CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MARJORY HALLIGAN,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>DAVID HILLBRAND, as Special Administrator, etc.,<br><br>     Defendant and Respondent. | A138328<br><br>(City & County of San Francisco<br>  Super. Ct. No. PTR-11-294184) |

Marjory Halligan (Halligan) appeals from an order entered after a bench trial in which the probate court denied her first amended petition for an order determining the validity of an amendment to a family trust document created by Ada C. Unruh, deceased, "so the [s]uccessor [t]rustee must administer and distribute the trust assets in accordance with the terms of the documents."  Halligan presents various arguments challenging the court's ruling that her first amended petition was time-barred under Probate Code section 16460, subdivision (a)(2) (§ 16460(a)(2))[1].  We see no merit to Halligan's contentions and, accordingly, affirm the order.

## FACTS

### A.    Background

In 1992, Ada C. Unruh (Unruh) created the Ada C. Unruh Revocable Living Trust (hereafter referred to as the trust agreement), naming herself as both trustor and trustee.

---

[1]    All further unspecified statutory references are to the Probate Code.

1

The trust provided, in pertinent part, that on Unruh's death certain trust personal property would be distributed to designated beneficiaries, Unruh's house in San Francisco would devise to her nephew by marriage, William James Shiloh Unruh (known as and hereinafter referred to as Shiloh), the residue of the trust personal property would be sold, and the remainder of the trust estate would be distributed to six designated beneficiaries. The trust also provided that as trustor Unruh "[had] the right at any time by an instrument delivered in writing to the Trustee to amend, modify, alter, revoke or terminate this trust in whole or in part," but that after her death, the trust "would be irrevocable" and not subject to amendment. At the death of Unruh, her brother-in-law Cecil Unruh was to act as successor trustee; if he was unwilling or unable to act, or failed to complete the administration of the trust, then Shiloh was to act as successor trustee; if he was unwilling or unable to act, or failed to complete the administration of the trust, then Lawrence K. Unruh (another brother-in-law) was to serve as successor trustee.

Sometime in 1998, Unruh met Halligan at a party. They became friends and continued to meet socially over the next several years. In 2002, Halligan moved into Unruh's house at the latter's request. Halligan acted as Unruh's companion and Unruh paid Halligan a stipend of $1,200 per month that was later increased to $1,300.

On November 14, 2007, Unruh met with her attorney Edward Watson (Watson) at her home. Unruh spoke with Watson about the changes she wanted made to the trust agreement. Unruh wanted her San Francisco house to go to Halligan and she wanted to change her bequest to Shiloh to $25,000. Watson said he was concerned that Shiloh would challenge the bequest. He advised Unruh to provide Shiloh with a larger sum and she agreed to do so. Before her meeting with Watson, Unruh had prepared a handwritten note indicating the changes she wanted made to her trust. The handwritten note initially stated, in pertinent part, "My house to Marjory Halligan if she is still with me," "2nd choice William James 'Shiloh' Unruh," "$25,000 to Betty Champaign," $25,000 to William James 'Shiloh' Unruh . . . [when he gets his junk out of my garage]," and "Rest to Marjory Halligan." During her conversation with Watson, Unruh apparently crossed out the amount she had initially provided for Shiloh and changed it to $50,000. At

2

Watson's request, Unruh gave the handwritten note to him. He asked for the handwritten note because it had all the information he would need to draft a formal trust amendment document. Watson did not consider Unruh's handwritten note to be a valid trust modification, and Unruh did not say anything from which Watson understood that she thought the handwritten note was a trust modification. According to Watson, Unruh knew and understood that Watson was going to prepare a formal trust amendment document. However, Watson was not able to prepare the document before Unruh's death on December 2, 2007.

On the day Unruh died, Halligan called Watson to determine "what [her] protocol was" for the disposition of Unruh's estate. Halligan's call was prompted by the fact that on November 14, 2007, from an adjoining room, she had overhead the entire conversation between Watson and Unruh regarding Unruh's wish to change her trust. Watson said Halligan needed to contact Shiloh and that she should work things out with Shiloh. [2] Halligan "freaked out" because she believed she was to contact Cecil Unruh if anything happened to Unruh. When Halligan asked Watson about the "notes" [3] he had taken from Unruh on November 14, 2007, Watson said he would have to check his file and get back to her. Halligan then called Shiloh and told him that Unruh had changed "her will," leaving her house to Halligan and leaving him $50,000. Shiloh said he wanted to see Halligan to review the trust agreement and explain the concept of a beneficiary. At their meeting, Shiloh gave Halligan a copy of the trust agreement. He offered to let Halligan stay in the house until her death, and drafted a contract to that effect on the back

---

[2]    After the death of Unruh, Cecil Unruh declined appointment as successor trustee, and the court appointed Shiloh as successor trustee; Lawrence Unruh had predeceased Unruh.

[3]    Although Halligan alleged in her first amended petition that Unruh handed Watson several handwritten notes dated November 13, 2007, at the trial only a single handwritten note, which was unsigned and undated, was admitted into evidence after being identified as Unruh's handwritten note given to Watson on November 14, 2007.

3

of the trust agreement.  Halligan signed the contract because Shiloh "threatened" her.[4]

Halligan again spoke with Watson and asked him for Unruh's notes.  Watson said Unruh's notes were "non-testamentary," but he agreed to her request to allow her counsel to contact him to review the notes.[5]  In the latter part of December 2007 before Christmas, Halligan called Watson and asked him about his "fee," and he replied, it was $5,000.  She did not know how much he would charge "for the house visit and to administer [Unruh's] estate," so she offered him a legal fee of $25,000.  She asked him to disregard the existing trust agreement and treat Unruh's handwritten note as a trust amendment, giving Unruh's house to Halligan and disinheriting Shiloh.  Watson did not accept the offered fee and told Halligan he was offended by the "offer" and it was not "his decision to make."  Watson thought Halligan's request was a bribe because a $25,000 legal fee for the size of Unruh's estate was "way out of line."  Halligan threatened Watson and then hung up.

To prepare for meeting counsel and to "preserve her testimony," Halligan drafted several multi-paged documents, dated December 12, 2007, December 23, 2007, December 26, 2007, and December 28, 2007, in which she wrote down everything she remembered since the day Watson came to the house to meet with Unruh.  Halligan first met with an attorney on December 31, 2007, and later met with other counsel.

---

[4] At the trial, Halligan testified that she kept the signed contract and put it in a hope chest in Unruh's bedroom.  However, when Halligan went to retrieve the document a few days later, she found that someone had "rifled" through the hope chest and the document was missing.  In lieu of the missing document, Halligan found "another brand-new copy" of the trust agreement with no writing on the back.

[5] At the trial, Watson testified that at various times, while he represented Shiloh, Halligan called and asked Watson for Unruh's handwritten note, which was ultimately seen by Halligan in March 2011.  On instruction of Shiloh, Watson had refused to earlier produce the note because it was his understanding that the note was "just [Unruh's] directions" to him and it was not "an actual amendment to her trust."  Nor was the note testamentary because it was not dated or signed by Unruh.  However, Watson admitted it was not for him to decide if the note was a valid trust amendment and he never sought court guidance as to what to do with the note.

In 2008, Watson, as counsel for Shiloh, sent Halligan a letter "of January 7th." The letter stated that Halligan was no longer Unruh's employee and her right to remain in the house was terminated. Later, Shiloh, represented by other counsel, filed an unlawful detainer action against Halligan and she was evicted from the house. After the eviction, Halligan did not attempt to regain entry to the house.

### B.     Probate Court Proceedings

On January 5, 2011, Halligan filed a petition in the probate court, pursuant to section 17200, seeking an order determining that Unruh's handwritten note given to Watson on November 14, 2007, constituted a valid amendment and modification "to the Trust, so the Successor Trustee must administer and distribute the trust assets in accordance with the terms of the documents." After the court sustained, in part, a demurrer filed by Shiloh, as successor trustee, Halligan filed a first amended petition (FAP), the operative pleading, on August 17, 2011.

In the FAP, Halligan again sought an order determining that Unruh's handwritten note given to Watson on November 14, 2007, constituted a valid amendment and modification "to the Trust, so the Successor Trustee must administer and distribute the trust assets in accordance with the terms of the documents." In support of her request, Halligan alleged Unruh's handwritten note satisfied the requirements of a trust amendment, under both the trust agreement and the Probate Code. She also alleged that Shiloh, as successor trustee, had violated his duties as trustee, by concealing Unruh's handwritten note from Halligan and the probate court; promoting his individual interest as the primary beneficiary of the original trust; putting his own interest ahead of Halligan when there was a conflict; and failing to administer and distribute the trust assets in accordance with Unruh's wishes. Halligan alleged, "[t]his Petition is not an action for damages for fraud, contempt, or theft. All Petitioner seeks is an order confirming that the handwritten trust amendment[ ] [is] valid and administration of the Trust in accordance with the amendment[ ]."

In addressing whether her claim was barred by any statute of limitations, Halligan alleged she could not have prosecuted this claim for the proper administration of the trust

"until she was made fully aware of the contents of the trust instrument, including amendments." Although aware of Unruh's true wishes, Halligan did not know, and could not reasonably be expected to know, that the handwritten note given to Watson constituted a trust amendment and modification. She further alleged that regardless of any fraud that may or may not have taken place, the trust administration was subject to continued probate court jurisdiction and therefore, it was irrelevant when she knew or should have known the contents of Unruh's handwritten note. According to Halligan, "[w]hat matters is that the Trust is not being administered as it was intended, and [she] was entitled to a ruling from the Probate Court to that effect compelling [Shiloh] to properly administer the Trust for the benefit of [herself] and the other named beneficiaries." She also alleged that "as the named beneficiary" of the trust as amended by Unruh, she was entitled to notice and a copy of the trust and all amendments, and until such notice was given, the limitations period on a claim to contest the trust had not begun to run.

David Hillbrand, as special administrator of Shiloh's estate,[6] filed an objection, arguing, in pertinent part, that the FAP was barred by the three-year limitations period for a claim for breach of trust by a trustee in section 16460(a)(2). According to Hillbrand, Halligan "discovered, or reasonably should have discovered, that the document that she claims to be a trust modification was a trust modification as of the death of [Unruh] on December 2, 2007. [Halligan's] petition was initially filed on January 5, 2011, but she should have filed her petition no later than December 3, 2010."

---

[6] Shortly after the court granted his demurrer to Halligan's initial petition and before the filing of the first amended petition, Shiloh died on September 1, 2011. David Hillbrand, as special administrator of Shiloh's estate and Halligan, through their attorneys, agreed to the appointment of Debra J. Dolch, doing business as Debra J. Dolch Fiduciary Services, a California-licensed private fiduciary, to serve as successor trustee, which was approved by the probate court. On June 22, 2012, Dolch filed a report concerning the sale of Unruh's San Francisco house and sought an order confirming the sale to a third party, which request was not opposed. The property was sold on July 16, 2012 for the sale price of $1,301,000, and Dolch, as successor trustee, has possession of the net proceeds of the sale. Dolch did not file any pleadings in the probate court and has not filed any brief in this court.

A bench trial was held, during which the probate court heard testimony from several witnesses including Halligan and Watson. The court also admitted into evidence several documents including the trust agreement and Unruh's handwritten note given to Watson on November 14, 2007. After considering Halligan's objections to its proposed statement of decision, the probate court issued a statement of decision denying the FAP on the ground it was barred by the three-year limitations period in section 16460(a)(2). The court found the limitations period began to run on Unruh's death on December 2, 2007, and Halligan discovered or should have discovered the facts giving rise to the subject of her claim in December 2007, more than three years before her initial petition was filed on January 5, 2011. The court also explained its reasons for rejecting Halligan's contentions that the limitations period in section 16460(a)(2) was tolled until Shiloh formally assumed the role of successor trustee and, alternatively, there was no applicable statute of limitations because the FAP only sought to have Unruh's handwritten note declared a trust amendment and did not seek relief for any alleged misconduct by Shiloh as successor trustee. The probate court filed an order denying the FAP, and Halligan's timely appeal ensued.

## DISCUSSION

### A. Applicable Law

"The probate court has exclusive jurisdiction over proceedings concerning the internal affairs of the trust. (§ 17000(a).) Such proceedings include '[d]etermining questions of construction of a trust instrument'; '[d]etermining the existence or nonexistence of any immunity, power, privilege, duty, or right'; '[s]ettling the accounts and passing upon the acts of the trustee'; '[i]nstructing the trustee'; '[c]ompelling the trustee to report information about the trust or account to the beneficiary' if certain conditions have been met; '[c]ompelling redress of a breach of the trust by any available remedy'; and '[a]pproving or directing the modification or termination of the trust.' (§ 17200(b)(1), (2), (5), (6), (7), (12), (13).)" (*Soria v. Soria* (2010) 185 Cal.App.4th 780, 786 (*Soria*).) "A proceeding concerning the internal affairs of a trust is initiated by petition to the probate court pursuant to sections 17200(a) and 17201" (*Soria*, at pp. 786-

7

787), and is governed by other sections of the probate code concerning the specific claim raised by the petitioner. At issue here are the separate probate code sections relating to proceedings concerning a trustee's duties in general and to report information and account to beneficiaries and the liabilities of trustees to beneficiaries (§§ 16000-16015, 16060-16069, 16400-16462.) [7]

The probate code sections addressing a trustee's duties include the duty to administer the trust according to the terms of the trust instrument (§ 16000); the duty of loyalty (§ 16002); the duty to deal impartially with the beneficiaries (§ 16003); the duty to avoid conflicts of interest (§ 16004); and the duty to report information and account to beneficiaries (§ 16060). "A violation by the trustee of any duty that the trustee owes the beneficiary is a breach of trust." (§ 16400.) "If a trustee commits a breach of trust or threatens to commit a breach of trust," a beneficiary may commence a proceeding for various purposes including "[t]o compel the trustee to perform the trustee's duties;" "[t]o enjoin the trustee from committing a breach of trust;" "[t]o compel the trustee to redress a breach of trust by payment of money or otherwise;" "to set aside acts of the trustee;" "to impose an equitable lien or a constructive trust on trust property;" or "any other appropriate remedy provided by statute or the common law." (§ 16420, subd. (a)(1), (2), (3), (6), (8), (b).) Section 16460 provides, in pertinent part: "(a) Unless a claim is previously barred by adjudication, consent, limitation or otherwise: (1) . . . (2) . . . [I]f a beneficiary does not receive any written account or report, the claim is barred as to that beneficiary unless a proceeding to assert the claim is commenced within three years after the beneficiary discovered, or reasonably should have discovered, the subject of the claim." Section 16460's limitations period, codifying a discovery rule, was added, in part, as a rejection of the contrary conclusion reached in *Di Grazia v. Anderlini* (1994) 22 Cal.App.4th 1337, in which the court there held that the limitations period on actions by a

---

[7]     The Probate Code includes specific provisions relating to proceedings concerning the modification and termination of trusts (§§ 15400-15410). Neither party asks us to consider those provisions, and accordingly, we do not further address those provisions in resolving this appeal.

beneficiary against a trustee of a express trust who did not account or report to that beneficiary did not begin to run in the absence of the beneficiary's actual knowledge of some unequivocal act in violation of duties of the trustee or in repudiation of the trust. (*Id*. at p. 1346; see Cal. Law Rev. Com. com. (1996 Amendment ), 54A Part I West's Ann. Prob. Code (2011 ed.) foll. § 16460, p. 279.)[8]

The probate code also contains several sections relating to a trustee's duty to report information and account to beneficiaries, heirs of a deceased trustor, and other persons. (§§ 16060 et. seq.) In pertinent part, when a revocable trust becomes irrevocable because of the death of the trustor, as in this case, a trustee is required to serve a notification on each beneficiary and may serve a notification on any other person (hereinafter referred to as the section 16061.7 notice). (§ 16061.7, subd. (a)(1), (b)(1), (j).) The section 16061.7 notice must include a warning that the served person "may not bring an action to contest the trust more than 120 days from the date this notification by the trustee is served upon you or 60 days from the date on which a copy of the terms of the trust is mailed or personally delivered to you during that 120-day period, whichever is later." (§ 16061.7, subd. (h).) Section 16061.8 provides, in pertinent part, that "[n]o person upon whom the notification by the trustee is served . . . may bring an action to contest the trust more than 120 days from the date the notification by the trustee is served upon him or her, or 60 days from the day on which a copy of the terms of the trust is mailed or personally delivered to him or her during that 120-day period, whichever is later."

### B.    Analysis

Halligan first argues that the trial court erred when it held her FAP was a claim for breach of trust against Shiloh as the successor trustee, and therefore, subject to the three-year limitations period in section 16460(a)(2). She correctly concedes "the applicable

---

[8]    Consequently, we reject Halligan's argument that the section 16460(a)(2) limitations period could not have begun to run until she had some knowledge of a breach of trust by either Cecil Unruh or Shiloh. None of the cases cited by Halligan holds that only an affirmative act by a trustee triggers the limitations period in section 16460(a)(2).

statute of limitations is determined by the substance or gravamen of the action rather than the form of the pleading." (*Hatch v. Collins* (1990) 225 Cal.App.3d 1104, 1110 (*Hatch*).) However, she contends the probate court "did the opposite of what *Hatch* teaches," by ignoring the "essentials" of her FAP and focusing on extraneous allegations, which suggested, in conclusory fashion, some wrongdoing by Shiloh as the successor trustee. We conclude Halligan's contention is unavailing.

Here, the probate court appropriately found the gravamen of the FAP was that Shiloh, as successor trustee, had breached his fiduciary duties by failing and refusing to recognize Unruh's handwritten note as a trust amendment and failing to distribute the trust assets to the named beneficiaries in accordance with the trust instrument as amended by Unruh's handwritten note. The ruling is supported by the FAP's allegations that Shiloh had committed the following breaches: (1) promoting his individual interest as the primary beneficiary of the trust and failing to avoid conflicts of interest; (2) failing to administer the trust as intended by Unruh's handwritten note; and (3) failing to distribute the trust assets in accordance with the trust as amended by Unruh's handwritten note. The FAP's allegations of other misconduct by Shiloh (concealment of Unruh's handwritten note and failure to send a statutory notice to Halligan) merely constitute additional allegations of breaches by the successor trustee, and do not change the nature of Halligan's claim. Accordingly, we conclude, as did the probate court, that the FAP alleged only a claim for breach of trust by the successor trustee subject to the three-year limitations period in section 16460(a)(2).

We also see no merit to Halligan's contention that even if the FAP contains allegations of breaches of trust by the successor trustee, it also seeks validation of Unruh's handwritten note as a trust amendment, which claim should be treated as a trust contest governed by sections 16061.7 and 16061.8. Accordingly, she argues her January 5, 2011, petition was timely because she was never served with the section 16061.7 notice and consequently, her time to file a trust contest within the 120-day limitations period in section 16061.8 never started to run. In support of her argument, Halligan asks us to consider *Bridgeman v. Allen* (2013) 219 Cal.App.4th 288

10

(*Bridgeman*), and *Straley v. Gamble* (2013) 217 Cal.App.4th 533 (*Straley*), which were decided after the probate court's ruling in this case. In each cited case, the appellate court considered whether a decedent's heir, who was served with the section 16061.7 notice, had timely filed a petition within the 120-day limitations period in section 16061.8. (*Bridgeman,* at pp. 293-295; *Straley,* at p. 538.) However, the cited cases and the probate code sections do not support Halligan's suggestion that if a trustee does not serve a section 16061.7 notice, a beneficiary or any other person may pursue a trust contest *at any time*. As noted, section 16061.7 concerns the trustee's obligations to serve notification on a beneficiary, heir of a deceased trustor, and any other person, under specified circumstances. The purpose of section 16061.8 is "to prohibit a person who receives notice from bringing an action to contest the trust after a specified period of time." (Legis. Counsel's Dig., Assem. Bill No. 1172 (1997 Reg. Sess.) 6 Stats. 1997, Summary Dig., p. 322.) The limitations period in section 16061.8 cannot be used "as a 'sword,' . . . [to] be invoked affirmatively . . . as the foundation of a right." (3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 439, p. 559.) In the absence of the service of a section 16061.7 notice, the probate court, as it did in this case, appropriately considers the gravamen of the petitioner's claim and then applies any applicable statute of limitations found in other sections of the Probate Code or the Code of Civil Procedure. (§ 1000 ["Except to the extent that [the Probate Code] provides applicable rules, the rules of practice applicable to civil actions, . . . , apply to, and constitute the rules of practice in, proceedings under [the Probate Code]"].) [9]

Nor do we see any merit to Halligan's challenge to the probate court's finding that she discovered or should have reasonably discovered the subject of her claim more than three years before she filed her initial petition on January 5, 2011. In its statement of

---

[9]  In her reply brief, Halligan argues for the first time that her time to file a petition did not begin to run while she was in possession of Unruh's house. Halligan did not raise this specific issue in her FAP or at any time during the probate court proceeding. "Thus, in fairness" we do not further address the issue and express no opinion on the matter in resolving this appeal. (*Strasberg v. Odyssey Group, Inc.* (1996) 51 Cal.App.4th 906, 916, fn. 10.)

decision, the probate court explained its ruling as follows: Halligan "knew at the time of Watson's visit to [Unruh] on November 14, 2007, that [Unruh] had requested that Watson prepare an amendment to her Trust to leave her house to [Halligan]. . . . And, [Halligan] testified that she overheard the entire conversation. Following [Unruh's] death on December 2, 2007, [Halligan] called Watson and he told her that the documents were non-testamentary. The Monday following [Unruh's] death, [Halligan] met with Shiloh. He showed her the Trust and prepared a contract for her to sign which allowed her to live in the house until she died. [Halligan] felt she was forced to sign the contract, but did so anyway. [She] had unpleasant exchanges with Shiloh regarding the house and his request that she move from the house. . . . [Halligan] called Watson before Christmas 2007 and offered him $25,000 to disregard the Trust and treat [Unruh's] notes as a trust amendment. Watson told her he was offended by what he interpreted to be a bribe, and in response [Halligan] threatened to sue him and hung up. There would be no reason for [Halligan] to ask Watson to treat [Unruh's] notes as a trust amendment, or to threaten to sue him, if she did not believe that [Unruh's] notes left the house to her. [¶] Moreover, [Halligan] testified that she began to write up documents in preparation for seeing a lawyer. [She] testified the documents she prepared in anticipation of meeting with lawyers were dated December 12, 13, 26, and 28, 2007. She met with an attorney on December 31, 2007 and other lawyers after that. . . . Although these documents . . . were excluded by the Court based upon attorney-client privilege, her testimony as to their date of preparation is not protected by the attorney-client privilege. [¶] . . . Based upon her conversations with Watson and Shiloh she was on notice of her claim immediately following [Unruh's] death. She knew or should have known of her claim."

Halligan now concedes, as supported by her own candid testimony, that by December 2007, she knew she had, or might have, a legal claim to ownership of Unruh's house as soon as Unruh died based on Unruh's conversation with Watson on November 14, 2007. Nevertheless, she argues she was not aware of facts that she had a claim for breach of trust against the successor trustee, and that the earliest event that put her on inquiry notice was her receipt of the January 7, 2008, letter from Watson,

informing her that she was no longer employed by Unruh and she had to leave the house. We disagree. To start the running of the limitations period, Halligan did not have to be "aware of the specific 'facts' necessary to establish" a claim for breach of trust against the successor trustee. (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110-1111 (*Jolly*).) Section 16460(a)(2)'s limitations period is triggered once a beneficiary is in "receipt of information sufficient to permit discovery of a claim" (*Noggle v. Bank of America* (1999) 70 Cal.App.4th 853, 860) and puts the beneficiary "on notice to take action" (*Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1123).

Halligan's arguments that her December 2007 conversations with Shiloh and Watson did not put her on the necessary inquiry notice are not persuasive. She contends there was no evidence that during those conversations she was told that Shiloh was acting in his capacity as successor trustee, that Watson was acting as Shiloh's lawyer, or that the successor trustee had breached the trust. However, she was told that neither Shiloh nor Watson would recognize Unruh's handwritten note as a trust amendment, which information put her on inquiry to ascertain whether her claim to any trust assets including Unruh's house would be honored by the successor trustee. And, indeed, Halligan candidly admitted at trial that her December 2007 conversations with Shiloh and Watson led her to seek the advice of independent counsel by December 31, 2007. She did not assert, and does not now assert on appeal, that she was lulled into inaction by her December 2007 conversations with Shiloh and Watson. Nor does the record demonstrate that Halligan learned any new facts regarding the subject of her claim from the date of Unruh's death on December 2, 2007, until she filed her initial petition on January 5, 2011. Rather, since the day of Unruh's death, Halligan has continually demonstrated her awareness of the facts essential to the subject of her claim as alleged in her FAP.

Halligan's contention that she could not file a petition until Shiloh was appointed successor trustee was properly rejected by the probate court. If Halligan was unable to ascertain the identity of the successor trustee, she could have filed a petition naming all of the successor trustees that were listed in the trust agreement, "naming Doe defendants, and then taking discovery to identify the [appropriate successor trustee(s)]. That . . . is

13

the normal situation for which the fictitious name statute, Code of Civil Procedure section 474, is designed: when the plaintiff is ignorant of the name of "a defendant," the plaintiff must file suit against the known wrongdoers, and, when the Doe's true name is discovered, the complaint may be amended accordingly. ( Code Civ. Proc., § 474.)" (*Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926, 932-933 (*Bernson*).) [10] The burden then would have fallen on each named and served successor trustee to prove that he had not breached the trust. (See *Jolly, supra,* 44 Cal.3d at p. 1113, fn. 12.)

In sum, we conclude the probate court properly denied the FAP on the ground it was time-barred. Halligan's time to act on her claim began to run in December 2007 and expired in December 2010, rendering her initial petition filed on January 5, 2011 untimely.

## DISPOSITION

The order is affirmed. Defendant and respondent David Hillbrand is entitled to costs on appeal.

_____

Jenkins, J.

We concur:

_____

McGuiness, P. J.

_____

---

[10] "Code of Civil Procedure section 583.210, subdivision (a), provides that the summons and complaint shall be served upon a defendant within three years after the complaint is filed. When the complaint is amended to substitute the true name of the defendant for the fictional name, the amended complaint 'relates back' to the timely original complaint and hence is not barred by the statute of limitations." (*Bernson, supra*, 7 Cal.4th at pp. 932-933, fn. 4.)

Siggins, J.