Filed 5/20/15  Stuart v. Allen Matkins et al. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| KATHERINE STUART, Individually and as Trustee, etc., et al.,<br><br>   Plaintiffs and Appellants,<br><br>        v.<br><br>ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS, LLP, et al.,<br><br>   Defendants and Respondents. | G049450<br><br>(Super. Ct. No. 30-2009-00303239)<br><br>O P I N I O N |


        Appeal from a judgment of the Superior Court of Orange County, Craig L. Griffin, Judge.  Affirmed.

        Blumberg Law Corporation, Ave Buchwald and John P. Blumberg for Plaintiffs and Appellants.

        Hill, Farrer & Burrill and Michael K. Collins for Defendants and Respondents.

# INTRODUCTION

Appellants, Katherine Stuart, the Stuart Family Trust, and Marshall Stuart Properties, LLC, appeal from a judgment entered against them after the trial court found they had failed to meet their burden of proof as to attorney malpractice and financial elder abuse. In essence, they contend the trial court listened to all the evidence and came to the wrong conclusions.

We do not reweigh evidence. If substantial evidence supports the judgment, we must affirm it. And appellants failed to preserve some of the issues they have now raised on appeal, by not properly drawing the trial court's attention to them, so we can't consider them. We therefore affirm the judgment in favor of attorney James McCormick and his law firm, Allen Matkins Leck Gamble Mallory & Natsis.

# FACTS

Although the appellants are Katherine Stuart, the Stuart Family Trust (the Trust), and Marshall Stuart Properties, LLC, the central figure in this case is Marshall Stuart, Katherine's husband. During the crucial time period in 2007, Stuart was making the decisions for the Trust and for the limited liability company. He was then 84 years old.

In 2007, Stuart sold property owned by the Trust and wanted to avoid paying taxes on the gain by means of a 1031 exchange.[1] After looking at several possibilities, he identified a commercial property in Santa Clarita as a suitable exchange. The property included a large building leased to a single tenant: Wickes Furniture Company. The lease term was 15 years, beginning in 2006, with 3 five-year options to renew in favor of Wickes.

---

[1] A 1031 exchange refers to the nonrecognition of gain or loss on certain kinds of property if the property is exchanged for other property of "like kind," as provided in the Internal Revenue Code, title 26 of the United States Code Service, section 1031. The exchange must conform strictly to the Internal Revenue Service rules, including some fairly short time limits.

To purchase this property, Stuart had to put up the proceeds of the recent sale ($6.4 million) and to borrow an additional $6.3 million. He borrowed the money from Merrill Lynch Mortgage Lenders; a balloon payment on the loan was due in 10 years. Stuart entered into an agreement to acquire the property in April 2007.

Stuart engaged a broker to assist him with the transaction, James Brashier, and Brashier in turn recommended James "Kimo" McCormick of the law firm of Allen Matkins Leck Gamble Mallory & Natsis to take care of the legal aspects of the transaction. Stuart engaged McCormick to perform legal services.[2]

Among the many tasks associated with the purchase and sale, the one that became the main focus of the litigation was obtaining the Wickes financial statement. The lease did not include a "cooperation clause," one that would have required Wickes to furnish the landlord with information regarding its financial condition. As a privately held company, Wickes was under no obligation to provide its financials to anyone unless it saw some benefit to itself – for example, obtaining a loan. Despite McCormick's and Brashier's strenuous efforts, the Wickes financials were not to be had, at least not for Stuart's perusal.

At first, Stuart refused to go through with the exchange unless he could see the financials. He was understandably leery of becoming the landlord of a single tenant whose financial condition was shrouded in mystery. But as the time to complete the 1031 exchange began to run out, he changed his mind. Based on the information he was able to compile, he decided that going through with the exchange – even without the financials – was preferable to the alternative: paying $1.3 million in taxes and putting the rest of the proceeds into municipal bonds. Escrow for the property closed on June 29, 2007.

---

[2] The law firm's engagement letter specified the scope of representation as the purchase of the Santa Clarita property, the financing of the property, reviewing the Wickes lease, and "other prospective real estate and business ventures."

3

Sadly, any tale of a real estate transaction occurring just prior to 2008 can have only one ending. In early 2008, Wickes declared bankruptcy. Wickes ultimately rejected the lease. The unsecured creditors, such as Stuart, received less than a penny on the dollar. The lender foreclosed, and Stuart lost the property.

Stuart individually and as trustee of the Trust sued both Brashier and McCormick, as well as their firms, for negligence, breach of fiduciary duty, negligent misrepresentation, and elder abuse.[3] Marshall Stuart Properties, a Delaware limited liability company formed to hold title to the property, was also a plaintiff. Stuart became incompetent, and his wife, Katherine Stuart, was appointed as his guardian ad litem in January 2011.[4] She also represented the Trust as trustee.

After a 12-day bench trial, the trial court held that neither the attorney defendants nor the broker defendants were liable for negligence or for elder abuse. Appellants have appealed only from the judgment in favor of the attorney defendants.

## DISCUSSION

"We review the trial court's factual findings for substantial evidence by examining the whole record, including conflicting evidence, in the light most favorable to the ruling below to determine whether there is reasonable, credible evidence of solid value to support that ruling." (*Ferguson v. Yaspan* (2014) 233 Cal.App.4th 676, 682.) We assume a judgment is correct, and all presumptions and intendments are indulged to support it, even on matters as to which the record is silent. It is the appellant's burden to show error. (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 546.)

---

[3] The fate of the misrepresentation cause of action is unexplained, but apparently it was not an issue at trial.

[4] The court found that Stuart was not displaying signs of age-related dementia at the time of the transaction.

We are advised that Stuart died on November 7, 2014.

4

# I.        Attorney Negligence

"The elements of a cause of action in tort for professional negligence are: (1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence.  [Citations.]" (*Budd v. Nixen* (1971) 6 Cal.3d 195, 200, superseded by statute on other grounds.)  "In addressing breach of duty, 'the crucial inquiry is whether [the attorney's] advice was so legally deficient when it was given that he [or she] may be found to have failed to use "such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake." [Citation.]' [Citations.]" (*Dawson v. Toledano* (2003) 109 Cal.App.4th 387, 397.)  To recover for transactional malpractice, a plaintiff must show that "*but for* the alleged malpractice, it is more likely than not that the plaintiff would have obtained a more favorable result." (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1244 (*Viner*).)  This "more favorable result" can take two forms:  a more advantageous agreement (a "better deal") or the collapse of the proposed transaction, leaving the plaintiff better off ("no deal").  (*Id.* at p. 1239; see *Wood v. Jamison* (2008) 167 Cal.App.4th 156, 164.)[5]

In this case, there is no question that, as Stuart's attorney, McCormick had a duty to him.  The question is, a duty to do what?  And assuming he had the duty ascribed to him by appellants, would the result to Stuart have been more favorable if McCormick had performed it?

---

[5]       Appellants do not refer to or cite *Viner* in their opening brief.  Their arguments on causation rely mainly on two other cases, one based on medical malpractice (*Cobbs v. Grant* (1972) 8 Cal.3d 229) and the other based on wrongful death (*Haft v. Lone Palm Hotel* (1970) 3 Cal.3d 756).  In their reply brief, appellants acknowledge the existence of *Viner*, but maintain it should not apply to this case.  *Viner* is the controlling authority on causation in transactional malpractice actions.

Appellants' focus on this issue in their appeal has shifted dramatically from their focus at trial. Trial testimony largely centered on the risk of going ahead with the 1031 exchange without the Wickes financials and whether Stuart had been adequately counseled about this risk by his attorney and his broker. On appeal, however, appellants have abandoned this tack. Now they concede that Stuart fully understood the risk of buying property leased to a single tenant whose financial statement he had not seen. He fully understood that this tenant might fail, leaving him holding the bag. What he did *not* understand – and what McCormick negligently failed to explain to him – was the risk that Wickes would *not* fail. Stuart's loan was due in 10 years, but Wickes had at least a 15-year lease, even disregarding the 3 options to renew. Because Wickes did not have to give him its financial statements, Stuart might have trouble refinancing or selling the property when his loan came due. A bank or a buyer would want to judge for itself how financially sound Wickes was, and Stuart could not compel Wickes to reveal this information. Had McCormick explained this risk to Stuart, so the argument goes, he would not have bought the property. He would have paid the taxes and put the rest of the sale proceeds into municipal bonds.

The trial court explained its rejection of this argument as follows: [Appellants] assert that [McCormick] breached [his] duty of care by failing to warn . . . Stuart of the risks of proceeding with a lease agreement that did not have a cooperation clause, because of the potential difficulties in refinancing the property after ten years. The evidence demonstrated, however, that . . . Stuart was well aware of a lack of a cooperation clause in the lease, as evidenced by the parties' unsuccessful attempts to obtain the Wickes' financials. True, . . . McCormick did not specifically point out that the Wickes lease would have five years left at the time then ten year loan became due, and that refinancing might be a problem without financials. But any failure to specifically point this issue out to . . . Stuart was not a legal cause of any of the losses

6

claimed here. Specifically, . . . Stuart's loss of the Santa Clarita property did not occur because the ten year loan came up, and he was unable to refinance."

What appellants maintain, in effect, is that, all evidence to the contrary notwithstanding, Stuart would not have bought the Santa Clarita property if McCormick had explicitly told him, "You know, you might have a problem 10 years from now trying to refinance or sell this property because Wickes doesn't have to give you financial statements." Moreover, Stuart could not have figured this potential problem out for himself, despite all the trouble caused during the 2007 transaction by Wickes' refusal to part with its financials. This highly sophisticated investor was somehow oblivious to the difference between the due date of his loan and the term of Wickes' lease – and the possible effect of this difference between 10 and 15.

The evidence presented at trial did not support this theory. Stuart was an experienced businessman who had engaged in several real estate transactions involving the sale and leasing of commercial buildings and borrowing money to buy property. He, or rather the Trust, also owned property leased to a single tenant. He had engaged in a prior 1031 exchange. Before he hired McCormick, he had already identified the Santa Clarita property he wanted to acquire. Stuart terminated the transaction in May 2007 because due diligence could not be completed in the time allotted in the agreement between him and the seller. Stuart could then have walked away without penalty. Instead, he continued negotiating. Stuart got his loan on the Santa Clarita property *without* giving the lender the Wickes' financials.[6] Appellants presented no evidence that things would be different in 10 years, if indeed Stuart still owned the property then. As for being unable to sell the property, *he* was buying it with the Wickes' financials unseen. He himself believed the risk acceptable; nothing suggested at the time that a worthy

---

[6] McCormick testified in response to questions posed by appellants under Evidence Code section 776 that the lender's attorney told him the lender had the financial statements, but was prevented by a confidentiality agreement from giving them to Stuart.

7

buyer would make a different assessment in 10 years or whenever Stuart decided he wanted to sell, which could have been before 10 years elapsed. In addition, the problems Stuart might face in 10 years paled beside the present certainty that he was going to have to give the government $1.3 million if he did not complete the 1031 exchange on time.

Finally, although the risk arose from the contract, specifically from the lease's lack of a cooperation clause, the risk itself was a business one. Stuart knew he could not require Wickes to turn over its financial information. The risk – as identified by appellants – was that some future business deal he may have wanted to do would be impeded or derailed because of his lack of leverage over Wickes. Stuart was in as good a position as McCormick – if not a better one – to assess this risk, which was, in any case, not a legal one. No law degree or legal experience was required to perceive and evaluate this risk. "The test to distinguish malpractice from other wrongs is whether the claim primarily concerns the quality of legal services." (Ronald E. Mallen, *Legal Malpractice* (2015 ed.) § 1:2, pp. 4-5.)

Appellants argue that one of a lawyer's basic duties is to advise, and McCormick breached this duty by failing to advise Stuart. No one disputes the duty to advise – the question is what the lawyer is to advise *about*. In this case, the trial court found Stuart was an experienced businessman who was well able to appreciate the relevant business risks involved in the transaction. He hired McCormick to do the legal work involved in putting the 1031 exchange together, not to advise him on business matters. Substantial evidence supports both the court's assessment of Stuart's business acumen and the resulting inference that McCormick had no duty to offer business advice to Stuart. As the trial court observed, "McCormick had no duty to point out what was clearly obvious to . . . Stuart: That closing the transaction without Wickes' financials carried considerable risk."

Appellants did not carry their burden of proof as to McCormick's duty to Stuart to warn him of a business risk or as to causation from failure to warn even

8

assuming there was such a duty. Substantial evidence supports the trial court's conclusions with respect to legal malpractice.

## II.        Breach of Fiduciary Duty

Appellants assign error to the trial court's "implied" finding that McCormick did not breach his fiduciary duty to Stuart by failing to disclose a social relationship with Brashier, the broker. Appellants have waived this issue on appeal.

The third amended complaint, the operative one here, did not contain an allegation McCormick breached his fiduciary duty to Stuart by failing to disclose a social relationship with Brashier. As to McCormick and his law firm, the complaint alleged, "The Attorney Defendants, breached said fiduciary duties by failing to provide an accurate analysis of the Dun & Bradstreet Report to [appellants], by failing to condition close of escrow on the obtaining of the Wickes' financial statements, and by failing to properly advise [appellants] of the potential adverse consequences of closing the transaction without all of Wickes' financial information thereby ensuring that [appellants] would proceed to close the transaction. They engaged in these acts and omissions to assure payment of their own fees and to aide [*sic*] and abet [Brashier and his firm's] objectives of assuring the deal would close and brokers' commissions and fees would be paid." The list of negligent acts in the malpractice cause of action did not include failing to disclose a relationship between McCormick and Brashier.

At trial, appellants' expert on attorney malpractice began to testify that McCormick violated Rule 3-310 of the Rules of Professional Conduct by failing to disclose to Stuart that he and Brashier had a social relationship.[7] Defense counsel objected immediately, telling the court, "There's no allegation in the complaint that any

---

[7]     Rule 3-310 of the Rules of Professional Conduct provides in pertinent part, "(B) A member shall not accept or continue representation of a client without providing written disclosure to the client where: .[¶] . . . [¶] (3) The member has or had a legal, business, financial, professional, or personal relationship with another person or entity the member knows or reasonably should know would be affected substantially by resolution of the matter . . . ."

part of this case is based on a breach of Rule 3-310 B or a failure to disclose the relationship." The court decided to allow the testimony and stated, "I'll take a look at the complaint and the scope of it and consider that and in considering the evidence." Appellants did not seek leave to amend the complaint to conform to proof during the trial.

After trial was over, the court issued a proposed statement of decision. The proposed statement did not mention a violation of Rule 3-310 or, for that matter, a breach of fiduciary duty. Appellants filed objections to the proposed statement; they did not mention a rule violation or breach of fiduciary duty or point out to the court that it had failed to make findings on these issues. The final statement of decision did not mention either of these issues.

Code of Civil Procedure section 634 provides, "When a statement of decision does not resolve a controverted issue, or if the statement is ambiguous *and the record shows that the omission or ambiguity was brought to the attention of the trial court* either prior to entry of judgment or in conjunction with a motion under Section 657 or 663, it shall not be inferred on appeal or upon a motion under Section 657 or 663 that the trial court decided in favor of the prevailing party as to those facts or on that issue." (Italics added.)

"A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness. [Citations.]" (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) A party may avoid these intendments and presumptions by objecting, pursuant to Code of Civil Procedure section 634, to the statement of decision. "[T]he party must state any objection to the statement in order to avoid an implied finding on appeal in favor of the prevailing party. . . . [I]f a party does not bring such deficiencies to the trial court's attention, the party waives the right to claim on appeal that the statement was deficient in these regards, and hence the appellate court will imply findings to support the judgment." (*Id.* at pp. 1133-1134.)

10

Appellants did not bring the omission of findings on Rule 3-310 or on fiduciary duty to the attention of the trial court when it objected to the proposed statement of decision. We therefore imply findings to support the judgment. Most likely, the trial court consulted the third amended complaint and concluded a rule violation had not been pleaded. As for the breach of fiduciary duty claim pleaded in the third amended complaint, appellants have now admitted Stuart "appreciated the risk entailed in buying a property leased to a single tenant that might fail," thereby undercutting any cause of action for failure to warn Stuart of potential adverse consequences stemming from the absence of the Wickes' financials.

**III.        Elder Abuse**

Welfare & Institutions Code section 15610.30, which defines elder financial abuse, provides in pertinent part, "(b) A person or entity shall be deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if, among other things, the person or entity takes, secretes, appropriates, obtains, or retains the property and the person or entity knew or should have known that this conduct is likely to be harmful to the elder . . . . [¶] (c) For purposes of this section, a person or entity takes, secretes, appropriates, obtains, or retains real or personal property when an elder or dependent adult is deprived of any property right, including by means of an agreement, donative transfer, or testamentary bequest, regardless of whether the property is held directly or by a representative of an elder . . . ." An "elder" is a person age 65 or older residing in California. (Welf. & Inst. Code, § 15610.27.) Appellants alleged in the third amended complaint that McCormick and his firm assisted and aided Brashier and his firm in pressuring and unduly influencing Stuart to close the transaction and failed to counsel Stuart about the risky effects of the missing financial statements. The trial court found "no evidence of bad faith or undue influence on the part of [McCormick] or [Brashier]."

11

Appellants now argue the trial court erred in its conclusion because it was based on the erroneous assumption that McCormick did not breach any duty to Stuart, specifically a duty to disclose his relationship to Brashier. We review the trial court's findings of fact for substantial evidence. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053, superseded by statute on other grounds; *Monks v. City of Rancho Palos Verdes* (2008) 167 Cal.App.4th 263, 295.)

The trial court's initial findings on elder abuse concentrated on Brashier. It found he had not pressured Stuart into closing the 1031 exchange. There was a need for some haste, but the need arose from the Internal Revenue Service rules regarding these exchanges, not from pressure applied by Brashier. The court referred to McCormick only in passing, stating in the proposed statement of decision, "[T]here was no evidence of bad faith or undue influence on the part of either Mr. Brashier or Mr. McCormick. Mr. Stuart needed timely assistance with a pending 1031 transaction that he had instituted on his own, and the evidence at trial demonstrated that each of these professionals put their full effort into achieving Mr. Stuart's goal."

The court did not mention failing to disclose McCormick's relationship with Brashier in connection with elder abuse. When appellants objected to the proposed statement of decision, they did not mention nondisclosure as a controverted issue the court had failed to resolve. The final statement of decision again focused on Brashier's conduct, mentioning McCormick and his firm only in passing. We therefore imply findings to support the judgment (see *In re Marriage of Arceneaux, supra,* 51 Cal.3d at pp. 133-134), which was that neither McCormick nor his firm engaged in elder abuse.

## DISPOSITION

The judgment is affirmed.  Respondents are to recover their costs on appeal.


BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


MOORE, J.