Filed 12/31/14; pub. & mod order 1/20/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JOLINE FERGUSON,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>ROBERT M. YASPAN,<br><br>    Defendant and Respondent. | B253338<br><br>(Los Angeles County<br>Super. Ct. No. BP125282) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Michael Levanas, Judge. Affirmed.

Greenberg Traurig, Scott D. Bertzyk; Law Offices of Steven W. Kerekes, Steven W. Kerekes, for Plaintiff and Appellant.

Oldman, Cooley, Sallus, Birnberg & Coleman, Marshal A. Oldman, Justin B. Gold, and Jamie N. Gonzalez, for Defendant and Respondent.

\* \* \*

Allyn Ferguson (Allyn)[1] and his wife, plaintiff Joline Ferguson (Joline), (collectively, the Fergusons) offered to sell their attorney, defendant Robert M. Yaspan (Yaspan) and his wife (collectively, the Yaspans) an interest in a London flat they owned. At Yaspan's suggestion, the Fergusons hired independent counsel and the parties exchanged five drafts before signing a written agreement in 1995. The trial court concluded that Joline's 2011 petition to set aside the agreement as a product of Yaspan's undue influence was untimely and without merit. We agree, and affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

In the 1980's, Allyn and Joline bought a flat in London overlooking Hyde Park for approximately $200,000, and put title to the property in the Wellington Trust (Trust).

In the early 1990's, the Federal Deposit Insurance Corporation (FDIC) sought to collect $2 million from Allyn and three others who had guaranteed a loan made to a music school. Allyn hired Yaspan, an attorney, to represent him. The FDIC agreed to settle for $800,000, with $200,000 coming from each guarantor, but Allyn did not have that amount available. Allyn's accountant, who was also one of the guarantors, loaned Allyn the money, secured by a $210,000 note interest in the flat (the Note). Yaspan continued to represented Allyn with respect to the FDIC through 1999.

In 1995, Allyn approached Yaspan with a business deal. Yaspan and his wife would become 50 percent co-owners of the Trust with Allyn and Joline; in exchange, the Yaspans would assume half of the Note and pay Allyn the equivalent of $200,000. This proposal enabled the Fergusons to recover nearly all of their original purchase price for the flat and still own half of it. Both the Fergusons and the Yaspans wanted to be partners with each other and not each others' children, so they agreed that whichever couple outlived the other would have the right to buy out the deceased couple's interest in the Trust before that interest could pass to anyone else.

---

[1]    Because the Fergusons and their daughter share the same last name, we use their first names for clarity. We mean no disrespect.

Recognizing the potential conflict of interest, Yaspan advised Allyn that he should hire independent counsel to advise him in drafting their tentative agreement. Allyn retained Keith Zimmet (Zimmet), who was an associate at the law firm of Lewitt, Hackman, Hoefflin, Shapiro, Marshall & Harlan (Lewitt Hackman). Yaspan had nothing to do with Allyn's selection of Zimmet. Because Lewitt Hackman had represented Allyn's accountant, who still owned the Note, the Fergusons waived the conflict between themselves and the accountant in writing.

Zimmet and Yaspan started negotiating. Yaspan prepared the initial draft. Over the next five months, Zimmet produced five more drafts, including the final draft.

All of the drafts, as well as the final agreement (Agreement), contained a "buy-out" provision: The substance of that provision remained the same in every draft, but the language used to effectuate it changed (and became increasingly "complicated"). In the first two drafts, paragraph 7.0 explained that "[i]n the event of the death of both of the FERGUSON'S [*sic*] or both of the YASPAN'S [*sic*] then the Trust shall buy out their interest at 50% of a deemed total value of $650,000 [and] shall fund such buy-out with a 10-year . . . life insurance policy . . . ." Later drafts relied on two different sections (sections 11 and 13) to provide that (1) the Trust would buy insurance and fund a $325,000 payment upon the death of the second spouse of either couple (paragraph 11(d)), and (2) either couple had the right to buy the others' share at $325,000 if the property was to be "sold" or "transferred" (paragraph 13), which Yaspan opined might apply to testamentary transfers as well. The Agreement also contemplated the simultaneous execution of a Second Amendment to the Trust itself, which contained the buyout and right of first refusal terms and also made the trust irrevocable.

The parties signed the Agreement in September 1995. At that time, Allyn and Joline were 70 and 68 years old,[2] and Yaspan and his wife were 49 and 47. Because the Fergusons were represented by Zimmet, Yaspan did not explain to them the terms of the

---

[2]     Joline is now in her 80's. We accordingly grant the parties' joint request for calendar preference. (*Warren v. Schecter* (1997) 57 Cal.App.4th 1189, 1198-1200; Code Civ. Proc., § 36.)

Agreement or its respective benefits and drawbacks. When Zimmet testified in 2013, he stated that he could not recall specifically what he told the Fergusons in 1995, but testified that he advised them regarding the Agreement and ensured they understood it before they signed it.

Neither couple took out the life insurance policies the Agreement contemplated. In 1999, Allyn and Yaspan asked the current trustee of the Trust to resign, and became cotrustees. That same year, Yaspan bought the Note. Some time thereafter, both the Fergusons and the Yaspans lost their copies of the signed Agreement, although the Fergusons did have copies of the initial and penultimate drafts. In 2004, the Fergusons retained a trust and estates lawyer who explained these drafts to them.

A year after Allyn passed away in 2010, Joline filed a petition and an amended Petition For Order Rescinding Second Amendment seeking, among other things, rescission of the Agreement, "general damages," and accounting. Yaspan filed a counterclaim to enforce the Agreement. The parties agreed to try the issue of the Agreement's validity first, and did so on eight days over the course of eight months.

The trial court upheld the Agreement. The court concluded that Joline's petition was barred by the four-year statute of limitations. On the merits, the court ruled that (1) Yaspan had been representing the Fergusons at the time the Agreement was signed, (2) the transaction did not comply with California Rules of Professional Conduct, rule 3-300 and was presumptively unfair under Probate Code section 16004, but (3) Yaspan had rebutted that presumption by demonstrating that the Agreement was fair and reasonable, and that Zimmet had served as independent counsel who had explained the Agreement and its implications to the Fergusons. In making these determinations, the trial court found Yaspan and Zimmet to be credible, and some of the testimony of Allyn and Joline's daughter Jillian Ferguson (Jillian) not to be credible.

The court entered judgment, and Joline timely appealed.

4

**I.      Timeliness of Joline's petition**

The trial court ruled that Joline's petition was barred by the statute of limitations for seeking rescission under Code of Civil Procedure section 337 because she did not file within four years of the end of her attorney-client relationship with Yaspan in 1999 or within four years of when her trust attorney in 2004 explained the buyout provision contained in the two drafts she possessed (and which were substantively identical to the final draft).

Joline argues that this ruling is incorrect for three reasons:  (1) no statute of limitations applies because she is asserting rescission defensively and is not seeking affirmative relief; (2) the limitations clock has yet to start running because it has been tolled while Yaspan has acted as a fiduciary to the Fergusons (as an attorney from 1995 to 1999, and as cotrustee of the Trust from 1999 until the present); and (3) Yaspan lulled the Fergusons into inaction by preventing them from obtaining a copy of the Agreement until 2010, and by misrepresenting to the Fergusons at a 2007 meeting that the Agreement contained no buyout provision.

We review the application of a statute of limitations de novo when the facts are undisputed.  (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191.)  We review the trial court's factual findings for substantial evidence by examining the whole record, including conflicting evidence, in the light most favorable to the ruling below to determine whether there is reasonable, credible evidence of solid value to support that ruling.  (*People v. Boyce* (2014) 59 Cal.4th 672, 692 (*Boyce*); *People v. Jackson* (2014) 58 Cal.4th 724, 749-750 (*Jackson*).)

**A.      Rescission as a defense**

The invalidity of a contract may be asserted either as a basis for affirmative relief or as a defense.  (See *Schuman v. Ignatin* (2010) 191 Cal.App.4th 255, 266.)  When a litigant seeks affirmative relief, her claim may be barred if filed outside the statute of limitations period.  (*Styne v. Stevens* (2001) 26 Cal.4th 42, 51-52.)  However, where invalidity is raised solely as a defense, there is no limitations period because statutes of

limitations are designed to "act as a bar to actions or proceedings"— not to individual claims or defenses. (*French v. Construction Laborers Revision Trust* (1975) 44 Cal.App.3d 479, 485-486.) Although the validity of the Agreement is germane as a defense to Yaspan's cross-claim, it is also a central component of Joline's petition— which seeks not only a declaration of rescission, but also general damages. Joline is accordingly seeking affirmative relief, and the four-year limitations period applies. (Code Civ. Proc., § 337.)

### B. Delayed accrual

As a general rule, statutes of limitations begin to run once every element of a cause of action has occurred. (*Strasberg v. Odyseey Group* (1996) 51 Cal.App.4th 906, 916 (*Strasberg*).) But this rule does not apply when the putative defendant is in a fiduciary relationship with the putative plaintiff; in that situation, the statute of limitations clock does not begin to tick until "the [putative plaintiff] has knowledge or notice of the act constituting a breach of fidelity." (*Eisenbaum v. Western Energy Resources, Inc.* (1990) 218 Cal.App.3d 314, 325 (*Eisenbaum*); *Strasberg*, at p. 916.) The existence of the fiduciary relationship limits the plaintiff's duty of inquiry by eliminating the plaintiff's usual duty to conduct due diligence, but it does not empower that plaintiff to "'sit idly by'" when "'"facts sufficient to arouse the suspicions of a reasonable [person][]"'"" "'come to his [or her] attention.' [*Electronic Equipment Express, Inc. v. Donald H. Seiler & Co.* (1981) 122 Cal.App.3d 834], 855)." (*Czajkowski v. Haskell & White LLP* (2012) 208 Cal.App.4th 166, 176-177, italics omitted; *Graham-Sult v. Clainos* (9th Cir. 2014) 756 F.3d 724, 743; *Eisenbaum*, at p. 325.)

Even if we assume Yaspan has been a fiduciary to the Fergusons since 1995,[3] the trial court did not err in concluding that the statute of limitations began to run by the time the Fergusons discussed the draft agreements with their trust attorney in 2004. Both drafts are substantively identical to the Agreement, and the language of the penultimate

---

[3] Because of this assumption, we do not need to decide whether Yaspan's status as a cotrustee of the Trust from 1999 until 2013 further invoked the delayed accrual rule.

6

interim draft is nearly identical to the language in the Agreement. Once the Fergusons' trust attorney explained the significance of that language, the Fergusons had before them sufficient facts to raise the voidability argument that she waited until 2011 to assert in her petition (and which we address below).

### C. Tolling due to lulling

A limitations period that has started to run can nevertheless be tolled if the putative defendant engages in "fraud in concealing a cause of action." (*Grisham v. Philip Morris, Inc.*(2007) 40 Cal.4th 623, 637.) Joline contends that Yaspan lulled her and Allyn into inaction (1) by keeping them from obtaining a copy of the Agreement and (2) by misrepresenting to them in 2007 that the Agreement did not contain a buyout provision (a) by making a statement to that effect and (b) by giving Joline a document purporting to "restate" the Agreement's terms that did not include a buy-out provision. The trial court ruled that the evidence did not support either contention.

Substantial evidence supports the trial court's ruling. Yaspan was never designated as the repository for the Agreement; Yaspan opened his files to the Fergusons when they asked him for a copy of the Agreement; and Zimmet, the Fergusons' own lawyer, was the one who provided a copy of the Agreement when Yaspan inquired of him. This evidence adequately supports the trial court's finding that Yaspan was not concealing the Agreement. The trial court also found credible Yaspan's trial testimony that at most he said he was uncertain about the Agreement's contents and that he did not himself draft or review the "restatement." Because we are not at liberty to disagree with these credibility findings (*Jackson*, *supra*, 58 Cal.4th at p. 749), the trial court's ruling on this ground is also supported by substantial evidence.

For these reasons, the trial court's ruling that Joline's claim is time-barred was not erroneous.[4]

---

[4] Joline also appears to attack the trial court's ruling that the equitable doctrine of laches does not apply. We need not address this issue because the ruling favors Joline and because the statute of limitations bar makes it unnecessary to address the further bar of laches.

## II.    Validity of Agreement

Attorneys are fiduciaries who owe their clients the "most conscientious fidelity." (*Fair v. Bakhtiari* (2011) 195 Cal.App.4th 1135, 1140-1141 (*Fair*).)  The law accordingly takes a jaundiced view of business transactions between attorneys and their clients.  (See *Mayhew v. Benninghoff* (1997) 53 Cal.App.4th 1365, 1369 (*Mayhew*) ["the law presumes" attorneys engaging in such transactions "wear" a "black" hat].)  Such transactions are not prohibited, but they are disfavored.  California Rules of Professional Conduct, rule 3-300 subjects a lawyer to discipline if he or she "enter[s] into a business transaction with a client" without first satisfying certain substantive and procedural prerequisites.  (Rules Prof. Conduct, rule 3-300.)  Rule 3-300 does not itself "provide a basis for civil liability" (*BGJ Associates v. Wilson* (2003) 113 Cal.App.4th 1217, 1227 (*BGJ*)), but its statutory counterpart—Probate Code section 16004—erects a presumption that transactions between an attorney and client "by which the [attorney] obtains an advantage" are a breach of the attorney's fiduciary duty and are the product of undue influence.  (Prob. Code, § 16004, subd. (c)[5] ["A transaction between the trustee and a beneficiary which occurs during the existence of the trust . . . and by which the trustee obtains an advantage from the beneficiary is presumed to be a violation of the trustee's fiduciary duties."]; *Fair*, *supra*, 195 Cal.App.4th at pp. 1152-1153 [applying section 16004 "to the fiduciary relation between attorney and client" and noting that section 16004 is a "statutory complement" to rule 3-300]; *BGJ*, *supra*, 113 Cal.App.4th at p. 1221 [noting presumption of "undue influence"].)  The presumption is rebuttable, and the attorney's inability to do so renders the transaction voidable at the client's option. (*BGJ*, *supra*, 113 Cal.App.4th at p. 1229.)

The trial court concluded that Yaspan was acting as the Fergusons' lawyer when they entered into the Agreement in 1995, so the pertinent question is whether the trial court erred in concluding that Yaspan rebutted section 16004's presumption of undue influence.  The presumption is rebutted by a showing that (1) "the dealing was fair and

---

[5]    All further statutory references are to the Probate Code unless otherwise indicated.

just, and [(2)] the client was fully advised." (*BGJ*, *supra*, 113 Cal.App.4th at pp. 1227-1228, quoting *Felton v. Le Breton* (1891) 92 Cal. 457, 469 (*Felton*); *Fair*, *supra*, 195 Cal.App.4th at pp. 1152-1153.)

Joline argues that Yaspan failed to establish either requirement because (1) the Agreement was not fair and reasonable, and (2) she and Allyn were never fully advised of the terms of the agreement by Yaspan himself or by Zimmet, who was not truly "independent" counsel. We review the trial court's factual findings for substantial evidence (*Boyce*, *supra*, 59 Cal.4th at p. 692), and the court's assessment of the fairness of the deal and adequacy of disclosures de novo because both are measured by an objective legal standard (see *Haworth v. Superior Court* (2010) 50 Cal.4th 372, 385).

### A. Fairness of the Agreement

Joline argues that the Agreement is unfair and unjust because the buyout provision guaranteeing the surviving couple the right to buy the nonsurviving couple's 50 percent interest in the Trust for a fixed price of $325,000 unfairly benefits the Yaspans over the Fergusons because (1) the value of the flat was more likely to appreciate than depreciate over time (making the $325,000 buyout price an unreasonably low price), and (2) the Fergusons were less likely than the Yaspans to be the beneficiaries of this windfall because they were older and thus statistically more likely to die first. Joline contends that the irrevocability of the Trust and the de facto requirement that both couples consent before either couple can sell its 50 percent interest to any third parties make the statistically probable and unfair outcome unavoidable. The trial court rejected these arguments. Joline asserts that the trial court erred by (1) looking at the fairness of the Agreement as a whole rather than focusing on terms she identifies as unfair, and (2) giving insufficient weight to the statistical likelihood that the buyout provision would favor the Yaspans. The trial court did not err.

### 1. Focus on the Agreement as a whole

Contractual language is construed ""in the context of the instrument as a whole."" (*Bay Cities Paving & Grading, Inc. v Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867.)" (*Regional Steel Corp. v. Liberty Surplus Ins. Corp.* (2014) 226 Cal.App.4th 1377,

9

1390.)  There are good reasons to take the same approach in evaluating the fairness and reasonableness of contracts.  Contracts contain many terms, with some terms favoring one party and other terms favoring the other party.  Focusing on just the unfavorable terms would invariably lead to the conclusion that a contract is unfair, even though other terms a court would be required by Joline's rule to ignore make the overall contract evenhanded and fair.

We agree with the trial court that Yaspan established that the Agreement, as a whole, is fair and reasonable to the Fergusons.  Although it is not dispositive (*Hawk v. State Bar* (1988) 45 Cal.3d 589, 599), it is worth noting that the idea to sell the flat was Allyn's.  Allyn then set the price that was at fair market value in 1995 and at an amount that enabled the Fergusons to recoup their initial investment in the flat and retain a half interest in it.  The Agreement reflected the couples' mutual decision to keep the Trust's ownership between the couples and not their children.  Zimmet negotiated to have the Yaspans pay half of the insurance premiums even though the premiums were higher for the Fergusons than the Yaspans.  And Allyn said he was "happy" with the Agreement before he signed it.

### 2.      Focus on fairness at the time of signing

"'It is blackletter law that whether a contract is fair . . . is determined with reference to the time when the contract was made and cannot be resolved by hindsight . . . .'" (*Coon v. Nicola* (1993) 17 Cal.App.4th 1225, 1238, quoting *Yeng Sue Chow v. Levi Strauss & Co.* (1975) 49 Cal.App.3d 315, 325; *O'Connell v. Lampe* (1929) 206 Cal. 282, 285 [looking to fairness at "the inception of the agreement"].)  This case confirms why this focus makes sense.  The buyout provision could be either a boon or a curse to the Fergusons depending on two variables unknown to the parties in 1995: (1) whether the flat would appreciate or depreciate in value (which could make the locked-in $325,000 buyout price a good or bad deal); and (2) whether the Fergusons or Yaspans would live longer.  Although the buyout provision could to this day be better for the Fergusons if the property suddenly declines in value or if Joline outlives both Yaspans, Joline asks us to declare the Agreement invalid based upon the statistical

10

likelihood of the various scenarios. We decline to do so. Injecting actuarial and other statistical studies into the assessment of fairness not only transgresses the "blackletter law" discussed above, it is also particularly inappropriate here where both variables—the parties' respective ages and the elasticity of real estate values—were obvious to the parties at the time the Agreement was signed. For these reasons, the trial court did not err in evaluating the Agreement's terms based on what was known to the parties in 1995.[6] We also deny Joline's request to take judicial notice of Yaspan's conduct vis-a-vis the Trust in 2014.

## B. Adequacy of disclosures

Joline further contends that Yaspan did not sufficiently establish that he advised her and Allyn of the "pros and cons" of the Agreement and its buyout provision. More specifically, she argues that (1) Yaspan was himself personally required to counsel the Fergusons on the drawbacks of the buyout provision, whether or not they retained independent counsel, (2) Zimmet, the counsel the Fergusons hired, was not in actuality "independent", and (3) Zimmet did not do a good job advising them about the Agreement's benefits and drawbacks. The trial court rejected all three arguments. So do we.

### 1. Duty to advise

An attorney rebuts section 16004's presumption of undue influence by showing that the client was "fully advised" regarding the contract. (*BGJ*, *supra*, 113 Cal.App.4th at pp. 1227-1228.) Rule 3-300 similarly requires "full[] disclos[ure]" (Rules Prof. Conduct, rule 3-300), and courts have interpreted this ethical rule (and its predecessor) to obligate the attorney to give "'to his client "all that reasonable advice against himself that he would have given him against a third person."'" (*Beery v. State Bar* (1987) 43 Cal.3d 802, 813, quoting *Felton*, *supra*, 92 Cal. at p. 469; *Passante v. McWilliam* (1997) 53 Cal.App.4th 1240, 1248; *Mayhew*, *supra*, 53 Cal.App.4th at p. 1369.)

---

[6]    For the same reasons, we reject Joline's related argument that the 50/50 split in the costs of the trust were unfair because of the small statistical likelihood that she would outlive both Yaspans.

11

Yaspan made no such disclosures to the Fergusons in this case; instead, he followed rule 3-300's requirement to advise the Fergusons to obtain independent counsel and they did so. So the question becomes: Can the duty to advise a client be discharged by the independent counsel the client retains?

Joline argues it cannot, while the trial court ruled it can. We agree with the trial court. Joline cites language in *BGJ* indicating that a client's retention of independent counsel does not absolve the lawyer of his or her duty under rule 3-300 to obtain the client's consent in writing to the terms of the transaction. (*BGJ*, *supra*, 113 Cal.App.4th at pp. 1226-1227.) From this, Joline extrapolates the principle that a client's retention of independent counsel does not absolve the attorney of the duty to personally advise his clients of the pros and cons of the proposed transaction.

We reject this extrapolation for three reasons. First, *BGJ* was construing rule 3-300, not section 16004. Noncompliance with rule 3-300 triggers section 16004's presumption (*Fair*, *supra*, 195 Cal.App.4th at p. 1153), but is not dispositive of section 16004; if it were dispositive, section 16004's presumption would be conclusive rather than rebuttable. Second, and more to the point, *BGJ* did not deal with the interaction of the same two requirements of rule 3-300 as are at issue here. *BGJ* held that a client's retention of independent counsel to give unbiased advice was not a substitute for having the client's written consent to the terms of the transaction. Here, the issue is whether the client's retention of independent counsel to give unbiased advice is a substitute for having the attorney entering into the transaction give advice. It is, at least where the attorney does not have any information bearing on the advisability of the transaction that is unavailable to independent counsel. Third, the alternative Joline proposes would disserve the purposes of rule 3-300 and section 16004 because it would not only permit— but *require*—the lawyer who is by law presumed to be exerting undue influence to give his clients advice about the proposed transaction even when those clients have retained a disinterested attorney to do the same. The potential for mischief arising when clients receive conflicting advice from their interested lawyer and their disinterested independent counsel is considerable.

12

## 2. Zimmet's independence

Joline next argues that Zimmet did not, in fact, act as independent counsel because (1) he was just a "scrivener" who did not provide them with any substantive analysis of the Agreement, (2) he did little more than rubber stamp Yaspan's initial draft, and (3) he labored under a conflict of interest.

Joline's first argument is belied by the record. Joline cites two snippets of testimony in which Zimmet is characterized as a "scrivener," but these pertain to his role in drafting the first amendment to the Trust and the letter requiring one of the Trust's trustees to resign. These passages do not have anything to do with Zimmet's role in drafting the Agreement or the Second Amendment to the Trust. Joline also cites portions of Zimmet's testimony in which he admits he cannot recall giving the Fergusons advice regarding the Agreement. However, she completely ignores his further testimony that his lack of recall pertains solely to *how* he gave advice; Zimmet testified that he was "absolutely" sure that he advised them regarding the advantages and disadvantages of the Agreement and ensured they understood it before allowing them to sign it. Joline lastly cites Jillian's testimony that Zimmet was present merely "to observe a signature", but ignores Jillian's further concession that she was living in Seattle in 1995 and had "limited knowledge" of her parents' business transactions, and ignores the trial court's finding that Jillian was not credible in many respects.

Substantial evidence also supports the trial court's finding that Zimmet acted as independent counsel. Zimmet drafted five of the six drafts of what eventually became the Agreement, and in those drafts substantially altered the language of the terms and also negotiated some of them to the Yaspans' detriment. The trial court found Zimmet's account of what he did to be "highly credible and compelling."

The trial court also correctly determined that the conflict that the Fergusons waived between the Zimmet's firm's representation of the Fergusons and Allyn's accountant had "nothing to do" with Yaspan. In any event, that conflict was knowingly waived in writing by the Fergusons. Joline also cites a 1999 letter in which Yaspan indicates that Zimmet had been representing both himself and the Fergusons in 1995, but

13

the contemporaneous evidence was to the contrary; Zimmet testified he only represented the Fergusons, and Yaspan "credibly" testified that his statement in the 1999 letter was incorrect.

### 3. Zimmet's competence

Joline finally argues that Zimmet did a poor job representing them as independent counsel. Even if true, her remedy lies with a malpractice suit against Zimmet, not a finding that the Agreement is invalid. But the evidence does not reveal any deficiency: The Fergusons were properly advised and expressed their "happ[iness]" with the Agreement before they signed it.

Joline seeks to impeach that conclusion with Jillian's testimony regarding Allyn's understanding of the Agreement years later, and with Yaspan's testimony that Allyn said he had unanswered questions before he signed the Agreement. However, the trial court found Jillian's testimony not to be credible, and Yaspan testified that he advised Allyn to speak with Zimmet before signing the Agreement. At most, the evidence on these points is conflicting, but that does not make it insubstantial. (*Jackson*, *supra*, 58 Cal.4th at pp. 749-750.)[7]

---

[7] In light of these conclusions, it is not necessary to decide whether the Fergusons ratified the invalid Agreement or whether the Agreement is severable.

14

**DISPOSITION**

The judgment is affirmed. Costs on appeal are awarded to Yaspan.

_____, J.
HOFFSTADT

We concur:

_____, P. J.
BOREN

_____, J.
ASHMANN-GERST

Filed 1/20/15

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| JOLINE FERGUSON, | B253338 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BP125282) |
| v. | |
| ROBERT M. YASPAN, | ORDER MODIFYING OPINION, DENYING REHEARING, AND CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Respondent. | |
| | NO CHANGE IN JUDGMENT |

THE COURT:*

It is ordered that the opinion filed herein on December 31, 2014, be modified as follows:

1.  On page 4, the second full paragraph, line 4, the word "counterclaim" is changed to "competing petition" so the sentence reads:

> Yaspan filed a competing petition to enforce the Agreement.

2.  On page 6, line 4, the word "cross-claim" is changed to "competing petition" so the sentence reads:

> Although the validity of the Agreement is germane as a defense to Yaspan's competing petition, it is also a central component of Joline's petition—which seeks not only a declaration of rescission, but also general damages.

---

\*      BOREN, P.J., ASHMANN-GERST, J., HOFFSTADT, J.

16

There is no change in the judgment.

Appellant's petition for rehearing is denied.

The opinion in the above-entitled matter filed on December 31, 2014, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

**<u>CERTIFIED FOR PUBLICATION</u>.**