Filed 5/4/21  Another Planet Entertainment v. Giraudo CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ANOTHER PLANET ENTERTAINMENT LLC, et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>LOUIS J. GIRAUDO, as Trustee, etc., et al.,<br><br>    Defendants and Respondents. | A158544, A159341<br><br>(Alameda County Super. Ct. No. RG15791797) |

Plaintiffs and appellants Another Planet Entertainment LLC, Gass Entertainment LLC, Another Planet Touring LLC and BGCA Management LLC (collectively, "APE") appeal from a judgment entered in favor of defendants and respondents the Robert M. Piccinini Trust utd March 18, 2002, and Louis J. Giraudo in his capacity as Trustee of the Robert M. Piccinini Trust (collectively, "Trust") following a bench trial.  The trial court denied APE's request for specific performance of a contract allowing it to purchase Trust's 30 percent share of the company at a preset formula on the grounds that the agreement was not

1

supported by adequate consideration and was not just and reasonable. (Civ. Code, § 3391, subds. 1 & 2.) It denied APE's alternative claim for damages for breach of contract on the grounds that such a claim was based on the value of the company, and APE had presented no evidence of the value of the company at the time of the breach. We conclude the trial court properly denied specific performance based on inadequate consideration and do not reach the issue of whether specific performance was also properly denied because the contract was not just and reasonable. We also conclude the court properly denied damages and affirm.

## I. FACTS AND PROCEDURAL HISTORY

### A. *Background—Formation and Financing of APE*

Gregg Perloff worked in the concert promotion business Bill Graham Presents starting in the 1970s. He started APE in 2003. Perloff needed capital for his venture, and Steven Kay, a San Francisco business attorney, introduced him to Robert Piccinini, a Modesto-based businessman who owned the Save Mart grocery chain and had invested in numerous other enterprises, including eventually a minority interest in the Golden State Warriors. Piccinini built his career around personal relationships founded on trust, but he also "drove a hard bargain" and had a reputation for being frugal.

Perloff and Piccinini "hit it off" immediately. Piccinini invested in APE and guaranteed a line of credit in exchange for a 30 percent interest in the company, which was held by the Trust. Perloff owned the remaining 70 percent and was its Chief

2

Executive Officer (CEO) in charge of its day-to-day operations. The company's Board of Directors was composed of three seats controlled by Perloff (Perloff, Sherry Wasserman (the President of APE) and Stephen Welkom (the Chief Operating Officer of APE) and two seats controlled by Piccinini (Piccinini and Kay).

The terms and conditions of Piccinini's investment in APE were documented in an agreement entitled the Summary of Terms, executed in November 2003, which outlined the co-owners' responsibilities to each other. It provided that Piccinini would receive a pro rata distribution whenever Perloff received one, and gave Piccinini the right to see some of the company's financial information.

The so-called Death Provision in the Summary of Terms addressed the parties' rights in the event one of them died. The provision allowed the survivor or the decedent's estate to request that APE or the survivor purchase the decedent's shares. If that purchase did not occur, APE had to liquidate and distribute the proceeds pro rata. No other sale of APE was permitted unless both Perloff and Piccinini approved the sale.

APE grew and became successful, and it was profitable for all but two years. In addition to producing events such as Outside Lands in Golden Gate Park each year, it eventually held the exclusive rights to book shows and events at venues such as the Greek Theater in Berkeley, the Fox Theater in Oakland, and the Bill Graham Civic Auditorium in San Francisco.

Piccinini was active on APE's Board and provided advice regarding the operations of the company. He referred to APE as

his favorite investment. Both he and Perloff wanted the company to continue operations if anything happened to one of them, but Piccinini did not want to continue his involvement in the company in the event Perloff died or became incapacitated and was no longer involved.

B. *Piccinini's Health Problems*

Piccinini was hospitalized several times in 2012 and at about that time his health took a turn for the worse. He suffered from heart disease, liver disease, kidney failure, recurrent pneumonia and a condition known as hepatic encephalopathy, which is associated with liver disease and involves the accumulation of excess ammonia in the bloodstream. This last condition causes forgetfulness, bad judgment and fatigue. Piccinini was a private person and did not disclose his health problems to Perloff and the people associated with APE, although he would tell Perloff about his hospitalizations after the fact. Piccinini's adult daughter Nicole Pesco noted that although Piccinini had been an incredibly sharp businessman throughout most of his career, he aged dramatically and did not appear to be himself during this period and she was concerned for a time that he had Alzheimer's disease or dementia. Dr. Auen, Piccinini's treating physician and friend, reported that Piccinini had an acute episode of hepatic encephalopathy that lasted for six months starting in September 2012, which could have affected his ability to understand documents he was signing.

C. *Option/Put Agreement*

Kay viewed the Death Provision in the original Summary of Terms as a "placeholder." After a Board meeting on May 7, 2012, Welkom, Kay and Piccinini had a conversation in which Kay mentioned that Piccinini and Perloff could create a new agreement that would replace the Death Provision in the original Summary of Terms. Piccinini agreed and told Kay to "write up" the agreement. Two days later, Welkom provided Kay with a copy of the Death Provision.

In early September, Kay prepared a "Buyout Scenario", stating the terms of a potential buy/sell agreement that eventually became the "OPTION AND PUT AGREEMENT" at issue in this case.[1] Kay provided a copy to Perloff, but did not send one to Piccinini, who did not use email. On September 6, 2012, Perloff and Kay drove to Modesto to meet with Piccinini and discuss the buy/sell agreement in generic terms. The day before the meeting, Piccinini had an appointment with Dr. Auen, and was noted to be "very tired and fatigued" and nearly fell asleep during the examination.

In late 2012, Kay spoke with Giraudo, who was a close friend of Piccinini's and who told him that Piccinini's "days were numbered." Kay responded, "I told those guys they've got to get up there." On December 6, 2012, Perloff traveled to Modesto to

_____

[1] A "put option" is an agreement giving an owner the right to sell a security for a predetermined price within a specified time frame. It is the inverse of a "call option," which gives a buyer the right to buy a security from the seller of the option. (See *Olagues v. Icahn* (2d Cir. 2017) 866 F.3d 70, 72, fn 1.)

5

meet with Piccinini, who took the meeting in his home. They discussed the buy/sell agreement. Perloff had several conversations over the months regarding a buy/sell agreement, and Perloff remembered he discussed the length of time that APE would have to exercise its option. Perloff recalled that they discussed the formula for the option.

Piccinini and Perloff executed the "OPTION AND PUT AGREEMENT" ("Option/Put") on March 18, 2013. It gave APE the option to purchase the Trust's 30 percent interest in the company at a set formula (the "purchase price") in the event Piccinini died. The option was to be exercised within one year of Piccinini's death. The Option/Put also gave Piccinini or his successor the right to require APE to purchase the Piccinini interest using the same set formula if Perloff died or became incapacitated.

The formula used to determine the purchase price took APE's average EBIDA (earnings before interest, depreciation and amortization) during the five years preceding the triggering event (the "lookback provision") and multiplied that figure by three (the "multiplier"). The purchase price for the Piccinini interest was 30 percent of the resulting number.

Kay was paid by APE for his role in drafting the Option/Put.

D. *APE's Efforts to Exercise Option and Lawsuit*

Piccinini died on March 24, 2015, approximately two years after the Option/Put was signed. He was 77 years old, and the

6

cause of death was thought by his doctors to be a combination of heart, kidney and liver failure.

On June 23, 2015, APE provided the Trust with a Notice of Exercise of Option Rights, stating it was exercising its option to purchase, at a purchase price to be determined in accordance with the formula in the Option/Put. In a letter dated October 19, 2015, counsel for the Trust rejected APE's exercise of its option rights "[p]ending further analysis, and the gathering of additional information," and noted the Option/Put appeared to be "entirely one-sided."

APE filed this lawsuit on November 2, 2015. The fifth amended complaint was filed in October 2017. It alleged a single cause of action for breach of contract and sought specific performance of the Option/Put. The complaint also contained two paragraphs alleging that in the alternative, if specific performance was not granted, APE "is entitled to recover damages because Mr. Piccinini's ownership interest had an intrinsic monetary value when the option/put agreement was executed, and the value of the interest at the time of [the Trust's] breach was higher than its value at the time the Option/Put Agreement was made."

The case proceeded to a bench trial, primarily on the theory that APE was entitled to specific performance of the Option/Put, i.e., it was entitled to buy the Piccinini shares for the formula stated in the Option/Put. Because specific performance was only appropriate if APE bore its burden of establishing that the Option/Put was supported by adequate consideration and was

7

"just and reasonable" (Civ. Code, § 3391, subds. 1 & 2), it presented evidence that Perloff and Piccinini had a cordial business relationship, and both wanted the company to continue operations, and that Piccinini had an interest in "monetizing" his shares, which were not readily transferable because they were only a minority interest in a closely held corporation.[2]  Although APE did not completely disavow an alternative claim for damages based on breach of contract, it did not, in its case-in-chief, present any evidence regarding APE's value at any point in time.

The Trust's theory was that APE had not proven that the consideration supplied to Piccinini for the right to purchase his shares was adequate.  It called Peter Woelflein, a valuation specialist at Deloitte Transactions and Business Analysis LLP, who analyzed the value of the Piccinini interest on February 13, 2013 (the date of the Option/Put) and March 31, 2015 (the end of the month following Piccinini's death, and the date used by APE's outside certified public accountant to calculate the purchase price for the Piccinini shares under the Option/Put).  Woelflein used two methodologies:  the discounted cash flow method (an income-based approach) and the guideline company method (a market approach).

On both dates considered by Woelflein, the purchase price yielded by the formula in the Option/Put was substantially less

---

[2] APE argued that Piccinini would have had difficulty selling a minority interest in a closely held corporation for any price on the open market, and therefore had an interest in a contract provision which gave him the right to sell his shares for a set formula price.

than the fair market value of the Piccinini interest: approximately 10 percent of the fair market value on February 13, 2013, and approximately 23 percent of the fair market value on March 31, 2015. Woelflein testified that the formula's use of a multiplier was lower than anything he had seen used in the entertainment business, and that a lookback period is usually limited to two years to obtain the most current information regarding a company's finances.

In rebuttal, APE called Gary Kleinrichert as a valuation expert for the purpose of critiquing Woelflein's analysis. Kleinrichert disagreed with the companies Woelflein had selected for his guideline company method of valuation, with the weight given to that approach, with the EBIDA margin and revenue growth rate used in the income-based approach, with the amount of the discount to account for lack of marketability, and with the lack of a "key person" discount to account for the value that only Perloff could bring to the company. Kleinrichert had not been retained to offer his own opinion as to APE's value.

The trial court issued a 33-page proposed statement of decision in which it denied APE's request for specific performance and damages. It concluded APE had not carried its burden of proving the consideration was adequate given the disparity between the valuation produced by the formula in the Option/Put and the true value of the company. It also concluded the contract was not "just and reasonable" as to Piccinini because he was cognitively impaired in the months leading up to the execution of the Option/Put and the negotiations were not sufficient to advise

9

him about the relationship between the valuation produced by the buyout formula and the true value of the company. The court specifically credited Woelflein's testimony regarding APE's value, and noted that APE had not presented its own valuation. It rejected the claim for damages, noting that there had been no evidence presented regarding APE's value as of the date of the alleged breach (Trust's failure to honor the option to purchase and sell APE the Piccinini shares for the price derived from the formula in the Option/Put).

APE filed a motion to reopen the evidence and asked the court to admit and consider its October 2015 financial statement to prove damages. The court denied the motion, in part because APE had objected to producing the statement before trial. It issued its final statement of decision finding against APE in its request for specific performance or damages based on its breach of contract claim. Judgment was entered, and attorney fees were awarded to Trust.[3] APE appealed.

## II. DISCUSSION

A. *Specific Performance—Civil Code section 3391*

1. <u>General Principles</u>

"To obtain specific performance after a breach of contract, a plaintiff must generally show: " '(1) the inadequacy of his legal remedy; (2) an underlying contract that is both reasonable and supported by adequate consideration; (3) the existence of a

_____

[3] Trust appealed the attorney fee award, but raises no challenge to the attorney fees in this appeal except to the extent it argues that reversal of the judgment changes who should be designated the prevailing party below.

10

mutuality of remedies; (4) contractual terms which are sufficiently definite to enable the court to know what it is to enforce; and (5) a substantial similarity of the requested performance to that promised in the contract.'" (*Real Estate Analytics, LLC v. Vallas* (2008) 160 Cal.App.4th 463, 472 (*Vallas*).) The second criterion arises from Civil Code section 3391, which, as relevant here, provides, "Specific performance cannot be enforced against a party to a contract in any of the following cases: [¶] 1. If he has not received adequate consideration for the contract; [¶] 2. It is not, as to him, just and reasonable. . . ." A party seeking specific performance has the burden of proving that Civil Code section 3391 has been satisfied. (*Vezaldenos v. Keller* (1967) 254 Cal.App.2d 816, 829.)

An order granting or denying specific performance of a contract is reviewed for abuse of discretion. (*Vallas*, *supra*, 160 Cal.App.4th at p. 472.) Findings under Civil Code section 3391 have been said to be reviewed for substantial evidence. (*Paratore v. Perry* (1966) 239 Cal.App.2d 384, 386; *Loeb v. Wilson* (1967) 253 Cal.App.2d 383, 388.) "But this test is typically implicated when a defendant contends that the plaintiff succeeded at trial in spite of insufficient evidence. In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who

11

had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case." (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1156.)

Where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court is whether the evidence compels a finding in favor of the appellant as a matter of law. (*Roesch v. De Mota* (1944) 24 Cal.2d 563, 570–571 (*Roesch*); *Caron v. Andrew* (1955) 133 Cal.App.2d 402, 409.) Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." (*Roesch*, *supra,* at p. 571.) We apply this standard when reviewing a ruling that the plaintiff did not carry his burden of proving adequate consideration or that the contract was just and reasonable under Civil Code section 3391.[4]

2. Consideration

The court found specific performance unavailable under subdivision 1, which requires a showing of "adequate consideration." APE had the burden of proof on this issue, but presented no evidence that showed the formula price, with or without the nonpecuniary benefits to Piccinini, approximated the

---

[4] The court will not consider APE's May 3, 2021 letter brief regarding the standard of proof because the cause had been submitted at the end of oral argument, and counsel provided no good cause for vacating submission. (See Cal. Rules of Court, rule 8.256(d)(1) & (e).)

actual value of his shares. Its key witnesses—Perloff, Welkom and Kay—did not know the value of Piccinini's interest at the time the Option/Put was executed, and APE specifically instructed the company's valuation expert to limit his opinion to a critique of the methodology used by Trust's valuation expert, and *not* to offer an opinion about the company's value.

In contrast, Trust presented expert testimony that the five-year lookback period was too long, and the multiple of three too low, and that a reasonable formula would have relied on a two-year lookback and a multiple of 7.5. The Trust's expert opined that the purchase price yielded by the formula was only about 10 percent of the true value of the Piccinini shares at the time the Option/Put was signed, and about 23 percent of the true value at the time of Piccinini's death.

The "inadequacy of price standing alone" may be grounds for denying specific performance. (*O'Hara v. Wattson* (1916) 172 Cal. 525, 535.) There is no specific degree of variation between the value and the agreed upon price that must exist. (*Haddock v. Knapp* (1915) 171 Cal. 59, 62.) "Whether the sales price in any particular case is fair and adequate is 'peculiarly a question of fact for the trial court to determine in the light of all the circumstances. . . .' " (*Gilbert v. Mercer* (1960) 179 Cal.App.2d 29, 31.)

The trial court could reasonably conclude that the purchase price yielded by the Option /Put formula was inadequate both at the time the agreement was executed and the time that the option was exercised after Piccinini's death. (See *Baran v.*

13

*Goldberg* (1948) 86 Cal.App.2d 506, 508, 513 (*Baran*) [affirming trial court's determination that consideration inadequate where purchase price under contract was $11,500 and value of property was $16,500 (purchase price was approximately 69 percent of value)].)

APE argues that in assessing the adequacy of the consideration, the trial court did not take into account the Option/Put's contingent nature. Citing *Ferguson v. Yaspan* (2014) 233 Cal.App.4th 676 (*Ferguson*), it notes that no one could predict when Piccinini would die or whether Perloff would predecease him, so it was unknown at the time the Option/Put was executed at what point in time the sale would take place and what the purchase price would be.

In *Ferguson*, two couples who co-owned a flat in London agreed that in the event both members of one of the couples died, the other couple would have the option of buying out the interest of the deceased couple for $325,000. (*Ferguson, supra*, 233 Cal.App.4th at pp. 681–682.) The court concluded that the many variables that existed when the contract was signed in 1991 (who would die first; would the housing market go up or down) made it appropriate to look to the point in time the contract was signed in determining whether it was fair—which it was. (*Id*. 686–687.)

The agreement in *Ferguson* was not alleged to be unfair when it was executed. (*Ferguson, supra*, 233 Cal.App.4th at pp. 686–687.) The buyout price applied evenhandedly to both couples who signed the contract—it was simply a matter of fortuity as to who would die first. (*Ibid*.) In this case, the court

14

found the purchase price yielded by the formula in the Option/Put to be inadequate at the time it was signed. Further, it called for the sale of Piccinini's shares using the formula price regardless of whether Piccinini or Perloff died, and did not call for the sale of Perloff's shares using the formula under any circumstances. Thus, the contingencies were not reciprocal in the same sense they were in *Ferguson*.

Nor is a different result required by *Walker v. Calloway* (1950) 99 Cal.App.2d 675, cited by APE, in which an ex-wife moved to another state to care for her dying ex-husband at his request, in exchange for his promise to leave her his estate. The court held that although the ex-husband died after only four months, the wife's move and provision of care for this period was sufficient consideration to allow her complaint seeking specific performance of the agreement to leave her the estate, noting: " 'the extent of the consideration is to be measured by the breadth of the undertaking rather than by the eventuality. Respondent might have had to serve and nurse for many years. Each party to the agreement knowingly stood the loss or gain by that contingency." (*Id*. at p. 682.) *Walker*, which was decided at the demurrer stage rather than after a trial, does not stand for the proposition that consideration will be adequate whenever it depends on events that cannot be defined with certainty at the time the contract was executed. And it was not dealing with a consideration that was found to be lacking at the inception of the contract.

15

APE also cites *Weinstein v. KLT Telecom, Inc.* (Mo. 2007) 225 S.W.3d 413, 415–416, in which the court concluded there was no failure of consideration where the plaintiff sold his majority interest in a company and had the option of selling his remaining shares to the buyer for $15 million within a specified period. This contract was held enforceable even though the shares had become worthless by the time the option was exercised. (*Id.* at p. 416.) Because the option was "a gamble, a lawful wager made between sophisticated parties as part of an arms-length transaction," the consideration was assessed as of the time the agreement was executed, when the shares were worth millions of dollars. (*Id.* at pp. 415–416.) Here, there was no showing by APE that the formula ever reflected the true value of the company, or that the consideration was adequate at the time the contract was executed. At least, the evidence did not legally compel a finding to the contrary. (*Roesch, supra,* 24 Cal.2d at pp. 570–571.)

APE also argues Piccinini received many intangible benefits from the Option/Put that rendered the consideration adequate: he "monetized" a minority interest in a closely-held corporation that would otherwise be difficult to sell; he made it possible for APE to continue operations after his death because it would not be obligated to liquidate if an agreement could not be reached (unlike the Death Provision of the original agreement); and in the event Perloff died first, Piccinini would get the benefit of a "lookback" to a period when the company would be worth more (and the purchase price would be higher) because of Perloff's stewardship.

16

These factors do not change the fact that at the time the Option/Put was executed, the formula it utilized yielded a purchase price of about 10 percent of what the fair market value of Piccinini's share was estimated to be, according to the only valuation expert who offered an opinion regarding the company's value. That expert testified that both the multiplier and lookback were unreasonable. APE did not present evidence that the formula would ever yield an approximation of the fair market value. The trial court specifically found that the intangible benefits to Piccinini under the Option/Put did not offset this "gross disparity."

APE argued at trial that the nonmonetary consideration was adequate because Piccinini was a shrewd businessperson and the Option/Put satisfied several of his nonmonetary objectives, rendering the consideration reasonable. But considerable evidence was presented by the Trust that at the time the Option/Put was executed, Piccinini's once-legendary business acumen was significantly impaired by his physical ailments, one of which was a build-up of ammonia in the blood that could have affected his ability to understand the documents he was signing. Indeed, given the evidence that was presented regarding Piccinini's frugality, it was reasonable for the court to conclude he would consent to a purchase price of only a fraction of the value of the company if in fact he was impaired. Whether or not this impairment would mean the contract was not "just and reasonable" under Civil Code section 3391, subdivision 2, it supports the trial court's conclusion that the consideration should

17

not be deemed adequate simply because Piccinini agreed to the terms of the Option/Put.

APE argues that because Piccinini accepted the benefit of the Option/Put for two years in the form of APE's "buy/sell assurance, its distributions, and its employees' labors," he cannot now complain that it was unjust. The "distributions" and "employee's labors" are benefits that inured to Piccinini by virtue of his 30 percent ownership of APE, not because of the Option/Put. And although the Option/Put gave him a buy/sell assurance, the court found that assurance to was not supported by adequate consideration. APE cannot point to it as an equitable basis for preventing Trust from arguing against specific performance.

We also reject APE's argument that it had "the [r]ight to [a]ssociate" with business partners of its own choosing, which was violated by the court's denial of specific performance because that denial allowed Trust, which is now controlled by Piccinini's heirs rather than Piccinini himself, to continue owning 30 percent of the shares. It may be that both Perloff and Piccinini wanted to be in business with each other, and not with their counterpart's heirs, but it is questionable whether APE can assert this argument on behalf of Perloff. In any event, the "[r]ight to [a]ssociate" does not take precedence over Civil Code section 3391, which requires that certain criteria be met before specific performance can be granted.

18

APE argues that because the Trust did not prove (or even allege) that Piccinini lacked the legal capacity to contract when he signed the Option/Put (see Prob. Code, § 810, 811; Civ. Code, § 1556), the court should not have relied on his diminished cognitive abilities to determine the contract was not "just and reasonable." Because we conclude that the trial court's decision to deny specific performance of the Option/Put was supported by its finding under the consideration prong of Civil Code section 3391, subdivision 1, we need not decide whether the court correctly determined the contract was not "just and reasonable" under Civil Code section 3391, subdivision 2. The finding of inadequate consideration was supported by the evidence and was sufficient to deny specific performance.

B. *Alternative Claim for Damages*

APE argues that assuming specific performance was not granted, it is entitled to damages. It urges us to calculate those damages as the high end of the fair market value of Piccinini's shares as calculated by the defense valuation expert at the time that Trust breached the Option/Put, less the amount APE would have paid for those shares under the formula. (*Maughan v. Correia* (2012) 210 Cal.App.4th 507, 519 [parties agreed damages for breach of contract of stock option is difference between fair market value at time of breach and option price].)[5] We disagree.

_____

[5] Assuming this may be a correct measure of damages in some cases, any damages would be limited by Civil Code section 3359, which provides, "Damages must, in all cases, be reasonable, and where an obligation of any kind appears to create a right to unconscionable and grossly oppressive damages, contrary to

19

APE's fifth amended complaint alleged that it was entitled to damages as an alternative to specific performance. However, it failed to present any evidence concerning the value of the company at any point in time. This was consistent with APE's trial strategy of focusing on specific performance, which would have been undermined by evidence that the consideration under the contract formula was substantially less than the fair market value.

After the court issued its tentative decision denying both specific performance and damages, APE moved to reopen the evidence and present a company financial statement from October 2015. The court denied the motion, in part because APE had successfully resisted providing the document during discovery by opposing a motion to compel its production as irrelevant because APE was not pursuing a claim for damages.[6] In its final statement of decision, the court rejected any claim for damages.

---

substantial justice, no more than reasonable damages can be recovered." It would not be reasonable to simply award APE the high range of fair market value less the purchase price when the consideration for the contract was deemed inadequate for the purpose of granting specific performance. (See *Schmidt v. Beckelman* (1960) 187 Cal.App.2d 462, 467, 471 [option to purchase land worth $250,000 for $33,000 was not reasonable].)

[6] In response to Trust's motion to compel, APE explained, "we're not setting out. . . to prove damages." It noted that if specific performance was denied, "we would not have been asking for damages."

The court did not abuse its broad discretion in ruling on the motion to reopen evidence. (*Horning v. Shilberg* (2005) 130 Cal.App.4th 197, 208 [ruling on motion to reopen the evidence reviewed for abuse of discretion]; *Rosenfeld, Meyer & Susman v. Cohen* (1987) 191 Cal.App.3d 1035, 1052–1053.) It is well-established that such a motion may be properly denied when the decision to not present the evidence was the product of trial tactics. (*Rosenfeld*, at p. 1053.) In this case, APE made the tactical decision not to produce the financial statement, despite the fact that the statement was well-within APE's control.

APE argued in the trial court that the defense evidence regarding the company's value merited an award of damages, even if the evidence was not reopened. The trial court rejected this claim. It concluded that Trust's valuation of the company on March 31, 2015, the date used to calculate the proposed buyout (two weeks after Piccinini's death) did not prove the value of the company as of the date the contract was breached (either in July 2015, when APE gave notice of its intent to exercise its option, or October 2015, when the Trust declined to sell the Piccinini shares). The court specifically rejected APE's argument that the March 31, 2015 valuation was close enough in time to the breach to prove the value of the company at the time of breach, noting that the company was alleged in the fifth amended complaint to have a " 'highly variable financial performance' " with " 'extreme fluctuations,' " such that the expert's opinion did not suffice to prove value at the time of breach several months later.

We do not disagree that an opposing party's expert may, in an appropriate case, supply evidence supporting damages, even when the plaintiff's own evidence on that point falls short. (*Farnsworth v. Hunter* (1938) 11 Cal.2d 27, 32.) And we also agree that sometimes, a party may prove the value of a good or realty at the time of a breach of contract by showing the value at a time that was only proximate. (See *In re Marriage of Hewitson* (1983) 142 Cal.App.3d 874, 882.)

But in this case, the court, sitting as the trier of fact, was not persuaded that it could infer what the value of APE was at the time of the breach based on expert testimony about its value several months earlier. It cited testimony concerning the volatility of the company's value, and we note that in support of Trust's opposition to APE's motion to reopen the evidence, Woelflein submitted a declaration stating that any valuation of the company on July 2015, when APE gave notice that it intended to exercise its option, or October 2015, when Trust gave notice the option was declined, could not simply be extrapolated from the valuation in March 2015: "Under applicable appraisal principles, the analysis would need to be performed 'from scratch.' "

The court thus found there was no persuasive evidence of APE's value at the time of the alleged breach. (See *Baran supra*, 86 Cal.App.2d at p. 512 [evidence of value at time contract was entered on September 8 did not prove value on November 8].) As the trier of fact, the trial court was " 'not required to believe even uncontradicted testimony.' " (*Madani v. Rabinowitz* (2020) 45

22

Cal.App.5th 602, 610.)  APE had the burden of proving damages. (*Richman v. Hartley* (2014) 224 Cal.App.4th 1182, 1186.)  To the extent those damages depended on evidence of APE's value at the time of breach, that evidence was not "uncontradicted and unimpeached" or "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." (*Roesch, supra,* 24 Cal.2d at p. 571.) Although we might have viewed the evidence differently in the first instance, we defer to the trial court's assessment of the evidence.

III.    DISPOSITION

The judgment is affirmed.  Costs to respondent Trust.

_____
NEEDHAM, J.

We concur.

_____
SIMONS, Acting P.J.

_____
RODRIGUEZ, J. *

*Another Planet Entertainment v. Robert Piccinini Trust* / A158544

---

\* Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.